Robert E. and Jane Ann Harden
**CLEMENT**

v.

The **UNITED STATES.**

No. 131–75.

United States Court of Claims.

July 14, 1978.

Charles A. Pinney, Jr., El Centro, Cal., for plaintiff.

James L. Malone III, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, for defendant. Theodore D. Peyser, Jr., Robert S. Watkins, and Michael J. Dennis, Washington D. C., of counsel.

Before DAVIS, KUNZIG and BEN-NETT, Judges.

## OPINION

PER CURIAM:

This is an income tax refund suit in which the issue is whether the taxpayers, limited partners in a cattle-feeding partnership, were entitled under the law as it stood in 1968 to deduct the cost of cattle feed bought in one year and consumed in the following year, as an ordinary and necessary business expense in the year of purchase. The Commissioner of Internal Revenue disallowed the $33,959 sought to be deducted, the taxpayers paid the deficiency and claimed a refund of $14,170, and this action followed the denial of the claim.

Trial Judge Schwartz, who held for the taxpayers, passed on three issues: (1) whether the prepayment for the feed in the purchase year was made for a business purpose and not for tax avoidance;[1] (2) whether allowance of the deduction for the feed in the purchase year would result in a material distortion of income; and (3) whether, even if there would be such a material distortion of income, the taxpayers were nevertheless entitled as farmers to deduct the feed-prepayment in the purchase year. The trial judge held, first, that the prepayment was made for a business purpose; this determination is accepted by the defendant and not challenged before the court. The second holding in the Trial Division was that the prepayment would in fact result in a material distortion of income; this ruling is now accepted and not attacked by the taxpayers before the court. The only ruling of the trial judge which is disputed before us is that, despite the material distortion of income, taxpayers were nevertheless entitled as farmers to deduct the pre-

payment in the year of purchase.[2] On that ultimate question we differ from the trial judge.

In *Part One* of this opinion, *infra* we adopt and set forth those portions of the Trial Judge Schwartz's opinion which are accepted by both parties (*see* note 2, *supra* ), *i. e.* the statement of the facts[3] and of the issues, the decision on business purpose, and the determination that there would be material distortion of income if taxpayers were permitted to deduct the feed-prepayment in the purchase year.

In *Part Two* of the opinion, *infra*, we discuss the reasons why, in our view, the deduction is not allowable, given the now-unchallenged finding of material distortion of income.

## PART ONE

*The Facts.* The plaintiffs together constituted one of 10 limited partners in a California partnership known as Vanderbilt Group No. 2.[4] The partnership was organized under an agreement filed on December 1, 1968, to engage in the business of buying, feeding and selling cattle. The taxpayers contributed $35,000 to the partnership's initial capitalization of $321,000, entitling them to a 10.90342 percent share in the partnership profits and losses.

The partnership agreement provided that the single general partner should enter into a "Cattle Feeding Advisory and Services Agreement" with a Mr. R. C. Chapman, of Whittier, California, doing business as the Whittier Cattle Company. The agreement with Mr. Chapman, made in December 1968,

---

1. It was conceded by the Government that the prepayment was a payment and not merely a deposit.

2. Taxpayers accept the entire opinion of the trial judge and ask us to adopt it. The Government accepts all except the concluding portion of the trial judge's opinion in which he holds that, despite the material distortion of income, taxpayers could deduct the whole prepayment in the year the feed was bought.

3. The necessary findings of fact are contained in this opinion.

4. The parties have stipulated that both plaintiffs, Robert E. and Jane Ann Harden Clement, husband and wife, were limited partners in the partnership, The record indicates that only Mrs. Clement invested and participated in the partnership. Her profits and losses, however, were reflected in the joint tax return jointly filed by both husband and wife.

vested him with management of the partnership's operations. He was authorized to propose cattle and feed investment programs, buy and sell both feed and cattle, locate feedyards for cattle and arrange the feeding, keep the partnership's accounts and manage its daily business.

Acting in his capacity as managing agent, Chapman on December 27, 1968 purchased $311,548 worth of cattle feed for the partnership in three lots:

1. 98,400 bushels of No. 2 yellow corn at $1.23 per bushel, a total of $121,032, bought from Cargill, Inc., Omaha, Nebraska, to be delivered to the Cargill warehouse at Omaha, Nebraska;

2. 2,563 tons of milo at $1.82 per hundredweight or $36.40 per ton, a total of $93,298, bought from Western Beef Grain Co., Amarillo, Texas, to be delivered to the Alamo Feed Yard, Calpatria, California; and

3. 1,980 tons of milo at $49.10 per ton, a total of $97,218, bought from Cargill, at Omaha, Nebraska, to be delivered in California between January and March 1969.

The purchase price was paid and the check cleared before the end of the year. The grain purchased was in existence; the partnership obtained warehouse receipts for the entire amount. The purchase of grain was the partnership's only business transaction in 1968.

The partnership filed an information return for 1968, reporting a gross profit of zero, a deduction of $311,548 on account of the purchase of grain and thus a net loss of $311,548. The plaintiffs' 10.9 percent share of the loss was $33,959, the only loss in the adjusted gross income they reported in their cash basis joint return for 1968. The loss reduced their otherwise gross income from $76,009 to $42,051. The return showed the following gains and partnership loss:

| | |
|---|---|
| Dividends | $17,587 |
| Interest | 4,993 |
| Rental property income | 5,902 |
| Trust Income | 17,820 |
| Operation of hobby shop | 3,959 |
| Sale/exchange of property | 23,948 |
| Miscellaneous (trustee fee) | 1,800 |
| Vanderbilt No. 2 loss | (33,959) |
| Adjusted Gross Income | $42,051 |

The adjusted gross income of $42,051 was reduced by deductions and exemptions to a taxable income of $26,865. As already noted, the Commissioner's disallowance of the loss of $33,959 is the basis of the present suit.

Chapman began to purchase cattle shortly after the beginning of the new year. It took about 2 weeks after the transaction for the cattle purchased to be delivered to the feedlot. While the dates of purchase are not clear on the record, cattle began arriving at the designated feedlots on or about January 15, 1969. The 4,268 head of cattle bought by the partnership arrived in 17 lots at the following dates between January and July 1969:

| | |
|---|---|
| January 15, 1969 | 573 head |
| January 17, 1969 | 124 |
| January 23, 1969 | 92 |
| March 24, 1969 | 100 |
| March 28, 1969 | 121 |
| April 21, 1969 | 146 |
| April 22, 1969 | 116 |
| April 24, 1969 | 248 |
| May 23, 1969 | 352 |
| May 26, 1969 | 372 |
| May 28, 1969 | 279 |
| June 2, 1969 | 244 |
| June 5, 1969 | 187 |
| June 20, 1969 | 1,113 |
| July 10, 1969 | 170 |
| July 14, 1969 | 10 |
| July 28, 1969 | 21 |
| | 4,268 head |

In the spring, Chapman exchanged the warehouse receipts for 44,000 of the 98,400 bushels of the partnership's corn in Omaha, for the same amount delivered to an Oakland, Iowa feedyard, on payment of a transportation differential. Thereafter, he sold back to his vendor, Cargill, the receipts for the remaining 54,400 bushels at Omaha for $1.2475 per bushel, less a storage charge of .0036 cents per bushel, and bought 55,000

bushels at Grand Island, Nebraska, for $1.22 per bushel.

The cattle owned by the partnership eventually consumed an amount of feed roughly equal to the amounts first purchased in the prior December, plus additional feed bought in 1969 at a cost of $59,429. Some small amounts of milo and corn were apparently left over and sold to feedyards, and the proceeds were reported as income. The partnership's gross profit on the sale of the feed cattle in 1969 was $271,936. Its information return in that year showed a gross profit in that amount, expenses of $130,340 and a net profit of $141,596, of which the plaintiffs' 10.9 percent share was $15,439.

Despite a profit from Vanderbilt No. 2 of $15,439, the taxpayer-plaintiffs' adjusted gross income was reduced by substantial losses from other investments to $4,423, as follows:

| | |
|---|---|
| Dividends | $9,937 |
| Interest | 3,018 |
| Rental property income | 3,976 |
| Trust income | 19,670 |
| Trustee fee | 1,800 |
| Operation of hobby shop | 817 |
| Sale/exchange of property | 15,880 |
| An unrelated business loss | (17,779) |
| Oil well investment expenses | (48,333) |
| Vanderbilt No. 2 income | 15,439 |
| Adjusted Gross Income | $4,423 |

Deductions and exemptions reduced taxable income to zero, actually a loss.

In 1970 the partnership in its information return reported a gross profit of $104,379 from the sale of cattle and feed, expenses of $46,424, including $29,875 for grain, and a net profit of $57,955, of which profit the plaintiffs' share was $6,345.

In 1970 the plaintiffs' adjusted gross income was $10,338, reflecting the profit of $6,345 from Vanderbilt No. 2 and further substantial losses in an oil well venture, as follows:

| | |
|---|---|
| Dividends | 2,614 |
| Interest | 3,206 |
| Rental property income | 4,517 |
| Trust income | 19,810 |
| Trustee fee | 1,800 |
| Operation of hobby shop | 1,917 |
| Sale/exchange of property | (1,000) |
| Partnership income (other than Vanderbilt No. 2) | 615 |
| Loss from oil well investment | (29,485) |
| Vanderbilt No. 2 income | 6,345 |
| Adjusted Gross Income | $10,338 |

Deductions and exemptions again, as in 1969, reduced the taxable income to zero, actually a deficit of $518.

*The Issues.* The issues requiring decision involve the application to the facts of the instant case of three tests for deductibility stated in Revenue Ruling 75–152, 1975–1 Cum.Bull. 144. In that Ruling, the Commissioner takes the firm position that a farmer who keeps his books under the cash receipts and disbursements accounting system may deduct, in the year of payment, the cost of feed which will be consumed in the following year, only if the three conditions are met:

. . . (1) the expenditure is for the purchase of feed rather than a deposit, (2) the prepayment is made for a business purpose and not for tax avoidance, and (3) the deduction will not result in a material distortion of income.

Furthermore, the first two conditions must be fully satisfied before consideration of the deduction's effect on income is proper. The first condition—that the expenditure be a purchase and not a deposit—is met on the facts, and is not in issue. The second and third conditions raise contested issues: whether the expenditure was made for a business purpose and whether the deduction materially distorted income.

*The Business Purpose of the Purchase.* The Government contends that the partnership's 1968 expenditures had none of the characteristics of a business purpose. In response, plaintiffs urge that a business purpose is not a prerequisite to deductibility where the prepayment is made pursuant to a binding contract and is not merely a deposit. Moreover, plaintiffs maintain that if a business purpose is required, it was present, because the costs of the advance purchases of feed were "ordinary and necessary expenses" of the partnership's cattle feeding business and deductible under the provisions of I.R.C. § 162(a).

A classic formulation of what is a deductible "necessary" business expense under I.R.C. § 162(a) is an expenditure that is "appropriate and helpful" in the accomplishment of the taxpayer's trade or business, while a deductible "ordinary" business expense is identified by reference to expenditures of the business community to which the taxpayer belongs. *Welch v. Helvering*, 290 U.S. 111, 113–14, 54 S.Ct. 8, 78 L.Ed. 212 (1933). Actual outlays for feed are ordinary and necessary, for they are entirely appropriate and helpful in the carrying on of the business of feeding cattle. Treas.Reg. § 1.162–12, T.D. 6548, 1961–1 Cum.Bull. 63.

The Government's contention as to business purpose goes, however, not to the thing bought, but to the timing of its purchase. The primary purpose of the decision to buy feed in December 1968, rather than in 1969 when it would be needed, the Government says, was not business benefit but tax avoidance. Business purpose would be conceded for a purchase in December of enough feed solely for the cattle soon to be delivered. Business purpose is contested for the purchase in December of feed for cattle bought in the following March and thereafter.

Plaintiffs assert that if a payment for cattle feed is more than a deposit—that is, if it is an actual purchase—its timing need not have a business purpose. Reliance is put on *Mann v. Commissioner*, 483 F.2d 673, 680 (8th Cir. 1973) in which an outlay in advance of need, made pursuant to a binding contract, was held deductible. There the court wrote that it found no "substantial support in the cases" for the Government's contention "that a benefit to the taxpayer is necessary to support the timing of a business expense deduction which meets the terms of § 162(a) in a situation where . . . payment is made pursuant to a binding contract." *Id.* at 680. The court went on, nevertheless, to find a business purpose; the purchase was held to benefit the taxpayer because it fixed a maximum price for feed, obtained for him a preferred position in case of a shortage, and assured known feed costs before the scope

of the operation was determined. Accordingly, the court commented that the "issue need not be decided to resolve this case in light of our determination that a benefit to the taxpayer has been established." *Id.* at 680.

Other cases cited for the dispensability of a business purpose also found a business purpose in fact. In *Gaddis v. United States*, 330 F.Supp. 741, 750 (S.D.Miss.1971) the prepayment was intended to forestall the impact of a possible rise in prices and feed shortage. In *Cravens v. Commissioner*, 272 F.2d 895, 897 (10th Cir. 1959) drought prompted the taxpayer to act to avert a feed shortage. Only in *Ernst v. Commissioner*, 32 T.C. 181, 185–86 (1959) did the court fail to find a business purpose, but there the issue was framed solely in terms of whether the prepayment was a deposit, and the court held the feed purchase expense incidental to carrying on a trade or business under section 162(a). There is, therefore, little authority for the proposition that an actual outlay for feed, not a deposit, may be deductible though made a year before it is needed, without regard to its lack of a business purpose. Acceptance of the proposition would confront the policy that tax consequences should be based on business reality and not on mere events created to avoid taxes. *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *Waterman S.S. Corp. v. Commissioner*, 430 F.2d 1185, 1193 (5th Cir. 1970), *cert. denied* 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971); *see also Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933). As in *Mann v. Commissioner, supra*, 483 F.2d at 680, however, the present case does not require a decision on the proposition, for as will be seen, there is evidence here of business purpose.

A number of factors may demonstrate a taxpayer's legitimate business purpose in prepaying for feed not consumed until the next tax year. Fixing a maximum price, obtaining a guaranteed supply to avoid the effects of a feed shortage, and obtaining advantages in the negotiation of

storage and delivery terms are some of such factors. *See Mann v. Commissioner*, 483 F.2d at 679–80; *Cravens v. Commissioner*, 272 F.2d at 899–900; *Gaddis v. United States*, 330 F.Supp. at 750; Rev.Rul. 75–152, 1975–1 Cum.Bull. at 144. If the taxpayer has a reasonable expectation of a business benefit when he purchases feed in the year prior to consumption, then the prepayment has served a legitimate business purpose. Rev.Rul. 75–152, *supra*.

■ The Government asserts that Vanderbilt No. 2 was not motivated by any reasonable expectation of a business benefit when it purchased grain in December 1968; that the partnership acted in haste and without a business plan for feeding operations, in order to create a deduction in 1968; and that the changes in the feeding plan in 1969—the 1969 resales and movement of the corn bought in 1968—indicate the actual lack of a feeding plan in 1968 and refute the plaintiffs' claim of legitimate business motivation in 1968.

The plaintiffs' response is essentially Mr. Chapman's testimony on trial that all his operations in 1968 and 1969 were according to an original plan, or amendment consistent with his original plan, to obtain an economic benefit. Chapman, who is an agricultural economist and has had considerable experience in the cattle business, testified as follows: In December 1968, he decided on the number of cattle he would feed and upon the general locations at which he would feed them—California and Oakland, Iowa, the closest feedyard to Omaha. He chose the Omaha area because it was one of the lowest priced feed markets and was expanding its packing plant capacity, thus assuring a demand for cattle. By thus increasing the partnership's business in a growing area, Chapman expected to avoid complete dependence on California markets.

Mr. Chapman explained his exchanges of Omaha corn for corn delivered at Oakland, Iowa, and his sale of Omaha corn and purchase of the same amount in Grand Island, Nebraska. Though he would purchase grain in Omaha, the location with the largest storage capacity and lowest prices, his first intention was to feed the partnership's midwest cattle in the feedyard closest to Omaha, which was in Oakland, Iowa. That yard, however, had only a limited capacity to store grain. He was aware, at the time he purchased the grain in Omaha in December, that he would have to pay a transportation differential to transfer the grain from Omaha to the feedyard in Oakland, as he did in fact in April 1969. The subsequent transfer of part of his feeding operation from Oakland to Grand Island, Nebraska, was in accordance with his practice in managing cattle feeding ventures, which was to shift yards when better terms were offered. He made the change, he said, in response to a better economic arrangement at the Harrington Feed Yard in Grand Island.

Chapman testified to economic justifications for the purchases in December. He explained that his studies had shown that in 8 of 10 years, grain was cheapest in the fall. Because prices tended to rise significantly in the spring, he wanted to fix his costs in December. Purchases in December also assured a sufficient supply of grain to feed the number of cattle that he planned to buy.

Continuing, he testified that the premium paid to obtain warehouse receipts (which normally sell at a premium of 1 to 5 cents because of their value as a warranty of the nature of the grain) was a hedge against the possibility of unexpected shortages. Having decided that feeding would take place in California and eastern Nebraska/western Iowa, his purchases in December served to assure that the grain would be in his planned general location when actual feeding began. By committing the partnership in 1968, he was also able to negotiate favorable storage rates, eliminating such charges entirely in some instances and incurring only partial charges in others.

A second witness for plaintiff, Mr. Leon Miller, also testified to the reasonableness of the partnership's 1968 purchasing decision. Mr. Miller is a California cattle marketer and grain trader with experience in the cattle feeding business. He testified

that it is a common practice in the Southern California cattle industry to purchase feed in the year prior to consumption, to ascertain the total cost of feeding the cattle, to protect against increased costs, and to help in obtaining favorable storage rates.

The Government's response to Messrs. Chapman and Miller is based entirely upon the testimony of its expert witness, Mr. Jack Ross, a feed grain analyst for the Economic Research Service of the United States Department of Agriculture. Citing forecasts of the Department which he had helped to prepare in the fall of 1968, Mr. Ross described the grain market at that time as one of ample supply and moderately rising demand with generally stable prices, except for an anticipated normal seasonal price rise of about 15 cents a bushel. Corn, he said, is the most significant factor in the grain market, because it is the dominant feed grain produced. The Department of Agriculture forecast a supply of 5.6 billion bushels of corn with total demand expected to equal 4.5 billion bushels. The market was very stable, he testified, with the Government controlling sufficient reserves to prevent any distortions. He concluded that in the market then existing, it was unnecessary and unreasonable for the partnership to purchase such large amounts of feed in December 1968, prior to the acquisition of its cattle in the spring of 1969.

The December purchases are held, on a weighing of the testimony of the opposing witnesses, to have had a business purpose. Mr. Chapman did assure himself of a supply. He did fix prices, thereby learning the scope of his costs for feed. His explanation of his movements of corn and feedlots in 1969 is credible and rebuts the Government's claim that his 1969 dealings in feed show haste and lack of planning in the purchases in December 1968, and nullify the price advantages Mr. Chapman obtained by purchasing before the seasonal advances in price. The Government has also argued that if the Grand Island price of $1.22 did not include the customary premium of 1 to 5 cents for warehouse receipts instead of actual feed, then the May price was higher than the December Omaha price, which had

included a premium for the guarantee represented by the warehouse receipts acquired. This is a small and speculative point. In fact, Chapman paid $1.23 per bushel to Cargill in Omaha in December, sold receipts for 54,400 bushels back to Cargill in the spring for $1.2475, less .0036 cents for storage, or a net cost of $1.2439, and bought 55,000 bushels in Grand Island for $1.22 per bushel, a total net profit of 0.0239 per bushel, or a total net profit of $1,300.16 on the 54,400 bushels first bought (.0239 × 54,400). The exchange of 44,000 bushels of Omaha corn for Oakland corn in April 1969 cost Chapman a transportation differential of .06 cents per bushel or a total of $2,640. But, he testified, it was part of his original plan to buy in Omaha and feed in Oakland. Chapman said that he expected in December that his prices then would be the maximum he would pay, and he seems to have been right.

There is not enough to the Government's case to overcome the convincing testimony of Mr. Chapman of the business reasons for his decision to buy in December, supported by the testimony of the additional witness that Chapman was following the common practice of breeders and cattle feeders in Southern California. The Government's evidence as to the Department of Agriculture forecasts may be accepted in full and yet it was Chapman's privilege to plan and buy as he did, for the reasons he gave. The businessman is allowed discretion to make business judgments. The Government's expert is neither a cattle breeder nor feeder nor grain buyer. He did not testify as to trade practice in Southern California or elsewhere, or trade reliance on his forecasts. Neither his forecasts nor hindsight in recounting the failure of prices to rise or shortages to develop negative the partnership's motive in its opening days to assure a supply of feed at a known price and thereby to fix the costs for feed before undertaking the required major outlays for cattle. The totality of the evidence establishes a business purpose under the authorities already cited, and this condition for deductibility is met.

*The Material-Distortion-of-Income Standard.* Revenue Ruling 75–152, 1975–1 Cum. Bull. 144, imposes, as well as the business purpose test, the condition upon deductibility in the year of payment for feed that the payment must not result in a material distortion of income. The material-distortion-of-income standard is derived from section 446 of the 1954 Code. Subsection (a) of section 446 requires that taxable income be computed in accordance with the accounting method which the taxpayer regularly uses in calculating his income, and subsection (b) authorizes the Commissioner to vary any method of accounting which in his opinion "does not clearly reflect income." [5]

Treas.Reg. § 1.446–1(a)(2) (1957) elaborates that books consistently kept in accordance with accounting principles generally accepted in the trade, and consistently applied year to year, will ordinarily be regarded as "clearly reflecting income." [6]

The Government contends that the plaintiffs' deduction from 1968 income of their share of the partnership's payments for feed in December of that year fails clearly to reflect, and results in a material distortion of, income; and that section 446(b) accordingly authorizes a directed change in accounting method to allot the expense to 1969, where it would more accurately match expenses and income. The authority in section 446(b), says the Government, includes discretion to disallow specific deductions that distort income. While not directly contesting the Commissioner's basic authority, the plaintiffs respond that application of the material-distortion-of-income standard is inappropriate when the taxpayer-farmer uses the cash basis accounting system, explicitly allowed by regulation, namely, Treas.Reg. § 1.471–6(a) (1958).

The Government is no doubt correct in its position that the Commissioner has broad discretion to modify a taxpayer's accounting method to insure a clear reflection of income. *See Commissioner v. Hansen,* 360 U.S. 446, 467, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959); *Lucas v. American Code Co.,* 280 U.S. 445, 449, 50 S.Ct. 202, 74 L.Ed. 538 (1930). Even where the taxpayer's accounting method complies with generally accepted principles, the Commissioner may reject it if he determines that it does not clearly reflect the taxpayer's income. *American Automobile Assoc. v. United States,* 367 U.S. 687, 692, 695, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961). And in challenging the Commissioner's determination, the taxpayer has a heavy burden of proof to show a clear abuse of discretion. *Fort Howard Paper Co. v. Commissioner,* 49 T.C. 275, 284 (1967). In *Wilkinson-Beane, Inc. v. Commissioner,* 420 F.2d 352 (1st Cir. 1970) the court found that an income of $129,899 computed by the taxpayer on the cash basis was not substantially the same result as the $127,804 of income under the accrual system directed by the Commissioner. The taxpayer, said the court, "must demonstrate substantial identity of results between his method and the method selected by the Commissioner." *Id.* at 356.

In seeking to exercise his discretion in this case, the Commissioner does not reject completely the taxpayer's choice of an accounting method. Concerned only with the timing of a particular deduction, the Commissioner would change the year of deduction from the year in which the feed was bought to the following year. It is settled that the Commissioner has discretionary authority to disallow a particular deduction on the ground that the timing of the payment distorts income. *Burck v. Commissioner,* 533 F.2d 768, 773 (2d Cir.

---

**5.** "(b) If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as in the opinion of the Secretary or his delegate, does clearly reflect income." I.R.C. § 446(b).

**6.** "A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year." Treas.Reg. § 1.446–1(a)(2) (1957).

1976); *Sandor v. Commissioner*, 62 T.C. 469, 476–77 (1974), *aff'd* 536 F.2d 874 (9th Cir. 1976).

■ *Burck v. Commissioner* involved a deduction of prepaid interest, a cost similar to the cost of feed bought in a year prior to its consumption. The Commissioner was held not to have abused his discretion in requiring a cash-basis taxpayer to use the accrual method to account for a prepaid interest deduction made on December 30. Noting "the ever-present potential for arbitrariness and evasiveness which is inherent in the cash-basis method of income tax accounting," the court held the Commissioner entitled to consider whether the prepayment of interest or of any other item resulted in a distortion of income. 533 F.2d at 769. The Commissioner might order a change in accounting for only one year or only one item out of several, as necessary to clearly reflect income, the overall accounting method to remain unchanged.

Additional authorities are *Commissioner v. Boylston Market Ass'n*, 131 F.2d 966 (1st Cir. 1942) and *Lovejoy v. Commissioner*, 18 B.T.A. 1179, 1182 (1930), cases in which cash-basis taxpayers were required to prorate, over the period involved, expenditures for insurance premiums and loan commissions. *Cf.* Treas.Reg. § 1.461–1(a)(1) (1957) (if expenditure by a cash-basis taxpayer "results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made.").

There is thus no doubt as to the Commissioner's discretion to require a change in an overall accounting method which does not clearly reflect income or, more specifically, to order a change in the treatment of a particular item where he finds that the accounting for it causes a material distortion of income. The next question is whether there is reason to hesitate to apply this rule in the case at bar.

Revenue Ruling 75–152, *supra*, lists some factors bearing on whether material distortion is present: "the customary business practice of the taxpayer in conducting his livestock operations, the amount of expenditures in relation to past purchases, the time of year in which the expenditure was made, and the materiality of the expenditure in relation to the taxpayer's income for that year." These factors serve as a guide in examining the facts of the instant case for material distortion of the taxpayer's income.

■ The partnership's deduction for feed taken in 1968 was $311,548, and no other transactions having taken place, this was the amount of loss reported in the partnership's information return. An expense of $311,548 is, in the absence of any income, of course material. In 1969, the partnership reported income of $141,596. Had the deduction been taken in 1969 instead of 1968, income for 1968 would have been zero instead of a loss of $311,548 and the 1969 return would have shown a loss of $169,952 instead of a profit of $141,596. The difference in result under the partnership's method of accounting as against that proposed by the Commissioner is plainly material.

The difference is equally significant in the returns of the partners, the taxpayer-plaintiffs. In 1968 their non-partnership income was $76,009. On taking their partnership loss of $33,959, they reported a gross income of $42,051 and a taxable income of $26,865. An expenditure or deduction of $33,959 is patently material in relation to an income of $76,400. In 1969 their gross income was less than $5,000 and their taxable income was zero. Had they taken the deduction for feed in 1969 instead of 1968, their taxable income in 1968 would have been $60,824 instead of $26,865 and their 1969 income would have remained at zero. Again the choice of year for the deduction yields very different results.

It is apparent that taking the deduction in 1968 instead of 1969 brought about a material distortion of income, whether the income in question be that of the partnership or that of the taxpayers.

## PART TWO

■ Despite his holding that there was a material distortion of income, Trial Judge Schwartz ruled that, since the taxpayers were farmers, using cash-basis accounting, they were entitled to the deduction in 1968. The core of his position was that farmers are expressly exempted by a long-standing regulation from having to use the inventory method of accounting if they do not wish to (*see* Treas.Reg. § 1.471–6(a) (1958)), that these taxpayers permissibly chose not to use the inventory method for their feed-supplies, and that the Commissioner's position would indirectly impose upon them the very inventory system which they allowably elected not to employ.

We come to the other conclusion because we view as decisive the undisputed finding here that, in the taxpayer's position, there would be a material distortion of income. Contrary to the trial judge, we see the Commissioner's refusal to allow deduction of the whole prepayment in 1968—having found that to result in a distortion of income—not as imposing the inventory system, but rather as consistent with the cash system as the latter method is defined by the regulations and utilized for income tax purposes. Treas.Reg. § 1.461–1(a)(1) (1957) —expressly prescribing the general rule for the taxable year of deduction for all taxpayers using the cash receipts and disbursement method—declares that "If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible,

or may be deductible only in part, for the taxable year in which made." Under that specific provision the feed-deduction must be taken, where there would otherwise be a material distortion of income, in the year or years that that kind of asset is consumed or utilized. Such treatment does not mean that an inventory system (applicable to "product costs") [7] is adopted *pro tanto* but only that "period costs" are recognized and melded into the over-all cash accounting method.[8] *See* Ward, *Tax Postponement and the Cash Method Farmer: An Analysis of Revenue Ruling 75–152,* 53 Texas L.Rev. 1119, 1153–1155, 1156–1157, 1161 (1975). The regulation makes that kind of treatment of "period" costs (at least if income distortion would otherwise result) a part of the over-all cash method for all taxpayers, including farmers. *Cf. Burck v. Commissioner, supra,* 533 F.2d 768, 772–74 (2d Cir. 1976).

In this instance the feed bought late in December 1968 was not consumed until several months after the beginning of 1969 and some even lasted into 1970. Thus, the expenditures for grain in December 1968 created (in the words of the regulation) an asset "having a useful life which extend[ed] substantially beyond the close of the taxable year [1968]." [9] Added to that fact is the unchallenged finding of income distortion if the whole prepayment was deducted in 1968.[10] Together, these elements justified the Internal Revenue Service in concluding that, even under the cash-basis method, the taxpayers could not deduct the whole feed-

---

7. "Product costs" are incurred in producing a product and are accounted for, under the inventory method, only on the sale of the products to which they relate. *See* Treas.Reg. § 1.471–1 (1958). In a cattle-growing business, for example, the cattle themselves could be included in inventory and accounted for on their sale or disposition. The Internal Revenue Service does not suggest that the feed be accounted for upon the sale of taxpayers' livestock.

8. "Period costs" arise with respect to time intervals rather than with particular products or services. Examples are rent, insurance, interest and supplies consumed over a span of time.

9. There is no question that this grain-feed asset was a separate and distinct asset for the plaintiffs.

10. As explained *supra* in Part One of this opinion (under the heading "The Material-Distortion-of-Income Standard"), it is now settled (and accepted by both parties in this case) that the Internal Revenue Service has discretion to disallow a particular deduction on the ground that the timing of that payment distorts income. We do not believe that this rule, as applied here, conflicts with *Security Flour Mills Co. v. Commissioner,* 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725 (1944). *See* Ward, *supra,* 53 Texas L.Rev. at 1159–1161.

prepayment in 1968.[11] As we have said, there was no violation of Treas.Reg. § 1.471–6(a) (giving farmers the option not to use inventories) since inventories were not imposed on the taxpayers; the present feed-expenditures were permissibly considered as "period costs," to be deducted as the feed was consumed. What the Service did was to treat plaintiffs like other cash-method taxpayers—and, except with respect to inventories, there is no indication that in 1968 either Congress or the Regulations treated farmers who chose the cash-basis method differently from other such taxpayers. For all cash-method taxpayers, comparable "period costs" (where there would otherwise be income-distortion) would be spread over a time-span, as were these taxpayers' 1968 feed expenditures.

*Cravens v. Commissioner*, 272 F.2d 895 (10th Cir. 1959), came to the opposite end-result, but that case differs from this one in at least three respects: (a) the *Cravens* court refused to find a distortion of income while here we have an unchallenged determination to that effect; (b) *Cravens* preceded Revenue Ruling 75–152, 1975–1 Cum. Bull. 144, and despite *Cravens* the Tenth Circuit itself held in *Cattle Feeders Tax Comm. v. Shultz*, 504 F.2d 462, 466 (10th Cir. 1974), that the predecessor of Rev.Rul. 75–152 could not be enjoined as plainly without any legal basis; and (c) the *Cravens* opinion did not consider the predecessor of Treas.Reg. § 1.461–1(a)(1), on which we rely. Similarly, the more recent decision in *Owens v. Commissioner*, 568 F.2d 1233, 1245–1246 (6th Cir. 1977), favorable to

that farmer-taxpayer, refused to find income distortion, and likewise did not discuss Treas.Reg. § 1.461–1(a)(1) or the Revenue Ruling.[12]

### CONCLUSION OF LAW

Upon the foregoing opinion, the court concludes as a matter of law that plaintiffs are not entitled to recover and the petition is dismissed.

---

**11.** It is fair to note that the part of Treas.Reg. § 1.461–1(a)(1) on which we rely was apparently not pressed by the Government upon Trial Judge Schwartz, as it was upon us.

**12.** Congress has recently dealt expressly with feed-expenditure deductions by "farming syndicates" (such as plaintiffs' entity appears to be). The Tax Reform Act of 1976, Pub.L. No. 94–455, § 207, 90 Stat. 1536 (1976) (to be codified in· 26 U.S.C. § 464), restricts the deductions that may be taken by farming syndicates, including partnerships in which more than 35 percent of the losses are attributable to limited partners:

"In the case of any farming syndicate * * a deduction * * * for amounts paid for

feed, seed, fertilizer, or other similar farm supplies shall only be allowed for the taxable year in which such feed, seed, fertilizer or other supplies are actually used or consumed, or, if later, for the taxable year for which allowable as a deduction * * *."

The Committee reports on this amendment cast no doubt on Rev.Rul. 75–152 and do not suggest that Congress was changing the law. S.Rep. No. 94–938, 94th Cong., 2d Sess., 56 n. 6 (1976) (1976–3 Cum.Bull. (Vol. 3) 49, 94 n. 6); H.R.Rep. No. 94–658, 94th Cong., 1st Sess., U.S. Code Cong. & Admin. News 1976, p. 2897, 42 n. 7 (1975) (1976–3 Cum.Bull. (Vol. 2) 695, 734 n. 7).