HAROLD J. HEINOLD and MARGARET L. HEINOLD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Heinold v. Commissioner
Docket No. 2518-77.
United States Tax Court
T.C. Memo 1979-496; 1979 Tax Ct. Memo LEXIS 30; 39 T.C.M. (CCH) 685; T.C.M. (RIA) 79496; December 10, 1979, Filed Delmar R. Hoeppner and Morris A. Sunkel, for the petitioners. Diane L. Fox and Richard Trogolo, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a deficiency of $163,592.00 in petitioners' 1972 Federal income tax. After *32 concessions, the sole issue is whether petitioners, as cash method taxpayers, may deduct the cost of cattle feed in the year of purchase and payment where the feed was not completely consumed until the following year. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Harold J. (hereinafter petitioner) and Margaret L. Heinold, husband and wife, resided in Kouts, Indiana, when they filed their 1972 joint Federal income tax return with the Internal Revenue Service Center, Memphis, Tennessee, and when they filed their petition in this case. Since 1942, petitioner has consistently filed his tax returns using the calendar year-cash receipts and disbursements method of accounting. Petitioner started farming and feeding cattle with his father in 1937 and continued these business activities on his own in 1942. In 1949, in addition to his farming operations, petitioner acquired a local stockyard for the purpose of feeding hogs before marketing them to packing houses. This business was incorporated in 1956 as Heinold Hog Market, Inc., and in 1964 the corporation formed a separate division for feeding and marketing cattle. The company has over eighty *33 stockyards in various cities in the states of Indiana, Ohio, Kentucky, Michigan, Illinois, Iowa, and Missouri. In 1966, petitioner formed Heinold Commodities, Inc., to assist customers of Heinold Hog Market, Inc., in trading on the futures market on the Chicago Mercantile Exchange. Both companies were very successful, but the need for cash for further expansion was a serious and recurrent problem. This problem was deepened by the fact that the stock of Heinold Hog Markets, Inc., and Heinold Commodities, Inc., owned primarily by petitioner and his wife, was not publicly traded. After consulting with a Chicago investment house in 1972 about obtaining funds needed for the continued growth of both companies, petitioner decided to merge the companies with DeKalb Ag-Research, a corporation which had publicly traded stock and which was also in the field of agriculture. As a result of the merger, petitioner and his wife received DeKalb Ag-Research stock valued at approximately $9,500,000. Having sold some of their DeKalb Ag-Research stock between October 31, 1972 and November 10, 1972, they realized a net capital gain of approximately $2,500,000. In 1972 petitioner decided to *34 acquire more cattle because he had funds available from the sale of his DeKalb Ag-Research stock which were not needed for reinvestment in his corporations and the purchase of more cattle looked like a favorable investment. In order to feed these cattle, petitioner also decided to acquire a one-half interest in a commercial cattle feedlot in Minatare, Nebraska. For several years prior to 1973, petitioner had used commercial feedlots for feeding his cattle because he lacked the funds to acquire the necessary facilities for feeding cattle on his own farms. When purchasing his interest in Minatare Feedlots, Inc. (hereinafter referred to as Minatare), petitioner intended to acquire cattle for feeding equivalent to one-half of the feedlot's capacity or approximately 7,500 to 8,000 head of cattle. His plan for acquiring that many head of cattle was thwarted, however, due to bad weather causing a muddy condition at the Minatare feedlot. From October 28, 1972 through December 22, 1972, petitioner purchased 4,936 head of cattle for approximately $2,000,000 for feeding at Minatare. Of these cattle, 4,688 head were alive and on hand at Minatare as of December 31, 1972. Petitioner continued *35 feeding these cattle through 1973 until their various sale dates, with the last head of these cattle being sold from the feedlot in January of 1974. From January 1, 1973 through July 31, 1973, petitioner purchased an additional 2,313 head of cattle for feeding at Minatare. Experiencing a death loss of 103 of these cattle, petitioner continued feeding the remaining cattle at Minatare until they were sold at various times during 1973 and 1974. The last of these cattle was sold from the feedlot in March of 1974. Since he intended to feed cattle numbering approximately one-half the capacity of Minatare, petitioner contacted Minatare's feedlot manager and directed him to negotiate the purchase of feed. Petitioner or his assistant were in contact with the feedlot manager on a daily basis prior to and during harvest time in 1972 regarding the price and the availability of feed items. In addition, petitioner made request trips to Minatare to assure himself of the quantity and quality of the corn, silage, and cattle that he was purchasing and were to be delivered at the feedlot. In determining the quantity of feed to be purchased during the 1972 harvest, petitioner considered not *36 only the amount of feed he expected his cattle would consume, but also the price of the various items at that time. Since petitioner had available funds, he was in a position to take advantage of favorable prices for the feed. Minatare was also a unique feedlot in that it was a converted sugar beet factory and therefore had a feed storage capacity approximately fifty times greater than the average commercial cattle feedlot. Harvest time for items of cattle feed in the Minatare, Nebraska, area is from September until early December and, generally, has been the most economical time for purchasing cattle feed. Some roughage items can only be acquired during the fall harvest season. Moreover, certain roughage items such as corn silage, beet tops, beet chips and green chop should be stored on the feedlot immediately after harvest before being fed to the cattle. This assures proper fermentation for preservative and nutritional purposes. In the fall of 1972, shelled corn, the primary feed item for cattle, was near the government support price, so it appeared likely that it would subsequently increase rather than decrease in price. The price of most cattle feed items did increase significantly *37 after the 1972 harvest except for shelled corn which, contrary to the normal market response when a feed item is near the government support price, went down slightly in price during the first four months of 1973 following the December 1972 purchase. [1]
The delivery of feed items to Minatare began in August of 1972 and continued throughout the harvest season. Except for sugar beet pellets, ordering for the purchase and delivery of feed to Minatare was well in advance of actual payment. As was the custom in the Minatare, Nebraska, area, feed purchased from regional farmers did not have to be paid for until after *38 delivery. When petitioner's feed was delivered, Minatare invoiced him for payment. Actual payment by petitioner, however, did not occur until November and December of 1972. Petitioner usually bought his corn silage and other silage types of feed at harvest time because that was when they were readily available and market conditions were more favorable. Although beets and corn would have been available in 1973, these feeds are difficult to obtain from western Nebraska to eastern Colorado outside of harvest time without paying substantially more for them due to additional storage and transportation costs. Petitioner also made bulk purchases of cattle feed during the 1972 harvest for two other commercial cattle feedlots he used which had the facilities for storage. During 1972 petitioner paid a total of $1,411,674 for feed for cattle, swine and poultry. Of this total feed expenditure, however, only one-half of the cost of the following three purchases totalling $568,057 is in dispute: Date of Check & No.
Cost of Feed
Description of Feed
11-24-72
2216
$136,025
250 Tons of Beet Pellets
12-1-72
2220
$158,664
8072.210 Tons of Corn Silage
($104,938.73)
2067.470 Tons of Green Chop
($20,674.70)
647.230 Tons of Beet Tops
($6,572.30)
126,735 Pounds of Shelled Corn
($26,478.27)
12-27-72
2253
$273,368
7,365,760 Pounds of Shelled Corn
($209,924.16)
6,344.35 Tons of Beet Chips
($63,443.50)
Total
$568,057
*39 Although the quantity of the feed purchases in dispute would have been inadequate to feed out the number of cattle petitioner originally intended to acquire in 1972, it was sufficient for the number of cattle he actually acquired in that year. Of the feed purchases in dispute, petitioner had feed valued at $550,095.18 remaining on January 1, 1973. This feed was completely consumed by July 31, 1973, and would have been consumed earlier if petitioner had not purchased additional feed for $117,500.51 in the second quarter of 1973. The three 1972 feed purchases in dispute and the feed purchased in 1973 were consumed by the cattle purchased during the last quarter of 1972 and those cattle purchased in the first two quarters of 1973 during the following months in the following dollar amounts: Cost of feed consumed
Cost of feed
from three disputed
consumed from
Month/Year
purchases in 1972
purchases in 1973
Dec. 1972
$17,961.48
Jam. 1973
86,588.62
Feb. 1973
79,789.88
Mar. 1973
90,396.37$3,593.17
Apr. 1973
77,336.55
14,024.01
May 1973
89,085.14
4,827.85
June 1973
87,546.55
26,888.00
July 1973
39,352.07
68,167.48
Aug. 1973
0
0
On his *40 1972 return, petitioner deducted $568,057, the cost of the three feed purchases in dispute, as an ordinary and necessary business expense. In the notice of deficiency, respondent determined that the method of accounting employed by petitioner in keeping his books and records did not clearly reflect his income and disallowed one-half of the $568,057 he deducted. OPINION The sole issue is whether petitioner, a cash method taxpayer, is entitled to deduct in the year of purchase and payment the cost of cattle feed which was not completely consumed until the following taxable year. Petitioner realized a large capital gain from the sale of stock in the last quarter of 1972. About that time he acquired a 50 percent interest in a cattle feedlot in Minatare, Nebraska, and purchased 4,936 head of cattle to feed at Minatare for approximately $2,000,000. In Novembe and December of 1972, he made three feed purchases totaling $568,057 for his cattle feeding operation at Minatare. Although the feed was paid for and delivered in 1972, it was not completely consumed until July 31, 1973. Petitioner maintains that the cost of the cattle feed is deductible as ordinary and necessary business *41 expense for which he had a valid business purpose. [2] He argues that, as a cash method farmer, [3] he is entitled to deduct in 1972 the full amount he paid for cattle feed in that year pursuant to section 1.461-1(a)(1) Income Tax Regs.[4]
Respondent conceded that the amount petitioner deducted in 1972 for feed consumed by March 31, 1973, was proper. Respondent maintains, however, that the amount petitioner deducted for feed consumed from March 31, 1973, through July 31, 1973, should be disallowed. Respondent's disallowance is based on essentially *42 two arguments: (1) petitioner was motivated by tax avoidance rather than a valid business purpose when purchasing the feed, and (2) the purchase of the feed consumed after March 31, 1973, created an asset having a useful life extending substantially beyond the close of the taxable year of deduction making it nondeductible in such year in that, under section 446(b), [5] the deduction caused a material distortion of petitioner's 1972 income. [6] Since our decision in this case is controlled by Van Raden v. Commissioner, 71 T.C. 1083, on appeal     F.2d     (1979), we hold for petitioner. *43 In Van Raden v. Commissioner, supra, the taxpayers, as limited partners, invested in a cash basis partnership cattlefeeding operation in mid-December 1972. During the last few days of 1972, the partnership purchased a one year supply of feed and some cattle. The Commissioner disallowed the deduction for the feed expense on the grounds that there was no business purpose for the prepayment of feed expense and that the deduction of the cost of the feed caused a material distortion of income in the year of purchase. On the basis of all the evidence, this Court found that there was a business purpose for the feed purchases and rejected the argument that the purchases caused a material distortion of income. Business purpose for the timing of a business expense deduction is a question of fact. The factor that generally distinguishes the court decisions allowing a deduction for prepaid feed costs from those disallowing the deduction is the reasonable expectation by the taxpayer of receiving some business benefit as a result of the prepayment. Lillie v. Commissioner, 45 T.C. 54, 62 (1965), affd. per curiam 370 F. 2d 562 (9th Cir. 1966); *44 Shippy v. United States, 308 F. 2d 743, 747 (8th Cir. 1962). If an expenditure is appropriate and helpful to the taxpayer's business, the courts are reluctant to override a taxpayer's judgment. Cravens v. Commissioner, 272 F. 2d 895, 899 (10th Cir. 1959), revg. 30 T.C. 903 (1958). Respondent contends that there was no business purpose for petitioner's purchase of shelled corn in November and December of 1972 because the prices for shelled corn were lower during the first quarter of 1973 than at the time of purchase in 1972. Although there was a slight decline in price in the first quarter of 1973 as compared to December 1972, we disagree with respondent's contention. Petitioner testified that shelled corn prices are usually lower at harvest time and that he expected the price to rise in 1973 due to bullish market trends causing most commercial cattle feeders to acquire more cattle for feeding than they had in previous years. Petitioner is a knowledgeable businessman and his testimony was forthright and credible. We believe that he had a business purpose in protecting himself from a speculative rise in the market price of shelled *45 corn. Moreover, respondent conceded that the feed purchased for consumption during the first quarter of 1973 was proper. After the first quarter of 1973, however, the price of shelled corn did increase significantly compared to the price at the time of petitioner's purchase. Therefore, if in 1972 petitioner had purchased only the amount of feed respondent conceded he was entitled to deduct in that year, and after the first quarter in 1973 had purchased shelled corn for the remainder of 1973, the cost of shelled corn would have been substantially higher not only due to a rise in market price, but also due to the additional costs of storage, handling, and transportation resulting from making the purchase outside the harvest season. For these reasons we find that petitioner derived a substantial business benefit from making the bulk purchase of shelled corn during the 1972 harvest season. As to the roughage feed items, we also find that the testimony of petitioner and his experts established a business purpose for the purchase of those items. Certain roughage feed items can only be acquired at harvest time. Furthermore, one of petitioner's experts testified that there are preservational *46 and nutritional benefits in acquiring roughage feeds at harvest and allowing them to properly ferment prior to their actual use. He further testified that bulk purchases of feed are preferable because changing feeds upsets the dietary habits of cattle causing them to reject the new feed for a short period of time. Another expert testified that although the feed purchases in dispute were insufficient to feed out the number of cattle petitioner originally intended to purchase, the amount of feed was not excessive for the cattle on hand at the end of 1972 and those purchased in early 1973. Due to our finding that petitioner had a business purpose for making the feed purchases in dispute, we find respondent's arguments for tax avoidance without merit. Petitioner is a successful farmer who has many years of experience in the business of feeding livestock. By making bulk purchases of feed he was able to fix the cost of feed which enabled him to ascertain the potential profitability of his feeding operation at Minatare. Moreover, his primary consideration in making the feed purchases was based on the number of cattle to be fed, not on the income tax deduction such purchases would *47 generate. See Lyon Co. v. United States, 435 U.S. 561, 580 (1978). In relying on Van Raden, we also note that the feed purchased in that case was not completely consumed until early in the second taxable year following the year of deduction. Here, the feed was completely consumed by July 31, 1973, six months after the taxable year in which the deduction was taken. Not only did petitioner have a valid business purpose, but the amount of the deduction for feed purchased was not nearly as great as that permitted in Van Raden. Finally, unlike Van Raden where the taxpayers were limited partners in a cattle feeding partnership former in the last few days of their taxable year, petitioner had been engaged in the business of feeding cattle for many years. In sum, we find that petitioner has shows he had a valid business purpose for making the three purchases of feed in November and December 1972. Respondent next argues that the feed purchased in 1972 but consumed after March 31, 1973, was a capital asset the deduction for which, under the principles of section 263, must be prorated over the period during which the feed is used. Section 1.461-1(a)(1), *48 Income Tax Regs., the argument goes, provides that "If an expenditure results in the creation of an asset having a useful live which extends substantially beyond the close of the taxable year," Such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made.[7] Relying upon section 446(b), which gives the Commissioner discretionary power to require a recomputation of income if the method used by the taxpayer does not clearly reflect income, respondent argues that allowing a deduction for the full amount of feed purchased in 1972 distorts petitioner's income. [8] Cf. Clement v. United States, 580 F. 2d 422, 428 (Ct. Cl. 1978), cert. denied 440 U.S. 907 (1979). *49 This Court rejected that argument in Van Raden, [9] and we reject it here. Petitioner's income in 1972 was not distorted because he failed to use all the cattle feed purchased in that year. The distortion is due to petitioner's failure to sell the cattle for which he purchased the feed so that income would be available to match the cost of the feed purchases. Such distortions can be prevented only by requiring farmers to employ a method of accounting which requires a matching of income with expenses. As set out above, however, the regulations expressly permit farmers to use the cash method of accounting.
In Van Raden, this Court refused to capitalize the taxpayers' feed costs by distinguishing "period" costs from "product" costs. Period costs are costs that arise with respect to time intervals rather than the creation of products or rendition of services. They are similar to overhead costs which are ongoing regardless of the size of the business. Unlike period costs which tend to be keyed to more than one taxable period, *50 feed or "product" costs do nt depend upon the mere passage of time but upon the size of the production process. Moreover, period costs are easily allocable to more than one accounting period, whereas product costs are not so easily allocable because their rate of consumption does not rest solely upon the passage of time.
Furthermore, in Haynes v. Commissioner, T.C. Memo. 1979-240 respondent's argument for capitalizing the cost of cattle feed was rejected as follows: Cattlefeed is not an asset having a "useful life" which extends substantially beyond the close of the taxable year within the meaning of the quoted language from section 1.461-1(a)(1), Income Tax Regs. The term "useful life" refers to an asset which is gradually exhausted through use or the passage of time. Cattlefeed does not deteriorate with the passage of time or become exhausted through use over an extended period. It is merely an inventory item which is consumed in the production of cattle for slaughter, and the inventory is reduced in a taxable period by the amount fed to cattle during that period. It is part of the cost of goods--the cattle--ultimately sold. [Footnote omitted.] Respondent's *51 position must also be rejected because farmers would be forced to maintain consumption records which would in effect require them to use the inventory method of accounting and deny them the option of using the cash method of accounting. Cash method farmers have historically been accorded special treatment due to the nature of the business including the effects of weather, seasonable nature of farming, the cyclical nature of feed prices, and, most important, the practical difficulties of using the inventory method of accounting. As explained by the Supreme Court in Catto v. United States,384 U.S. 102, 116 (1966): The sacrifice in accounting accuracy under the cash method represents an historical concession by the Secretary and the Commissioner to provide a unitary and expedient bookkeeping system for farmers and ranchers in need of a simplified accounting procedure. Over a period of time, consistent utilization of the cash method will produce a fair result. A "distortion" in one year will be offset by a "distortion" in another year so that over a period of time the taxpayer's income will be clearly reflected. To reflect the foregoing, Decision will be *52 entered under Rule 155.
Footnotes
1. Note the following comparison of the National average price per bushel of shelled corn during late 1972 and early 1973 from annual Summaries of Agricultural Prices of 1972 and 1973 as compiled by the Crop Reporting Board Statistical Reporting Service, U.S. Department of Agriculture, Washington, D.C.
1972
Sept.
Cot.
Nov.
Dec.
1.22
1.19
1.20
1.42
1973
Jan.
Feb.
Mar.
Apr.
1.39
1.35
1.37
1.42
May
June
July
Aug.
1.61
1.99
2.03
2.68
These prices are exclusive of trucking, handling, and other delivery costs.↩
2. Section 1.162-12(a), Income Tax Regs.↩, provides, in part, that "the purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay * * *." 3. Section 1.471-6(a), Income Tax Regs.↩, provides that a farmer has an option to use the cash receipts and disbursements method or the inventory method of accounting. 4. Section 1.164-1(a)(1), Income Tax Regs.↩, provides that "Under the cash receipts and disbursements method of accounting, amounts representing allowable deductions shall, as a general rule, be taken into account fo the taxable year in which paid."
5. Statutory references are to the Internal Revenue Code of 1954, as amended. SEC. 446(b) provides as follows: SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (b) Exceptions. -- If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, if the opinion of the Secretary or his delegate, does clearly reflect income. ↩
6. Respondent's position is based on Rev. Rul. 75-152, 1975-1 C.B. 144↩, which sets out the following three-part test for determining whether the cost of feed to be consumed in a following year may be deducted in the year of payment: (1) The expenditure for feed must be a payment, not merely a deposit; (2) the prepayment must be for a business purpose, not merely for tax avoidance; and (3) the deduction of such costs in the taxable year must not result in a material distortion of income. Respondent concedes that the first part of the test has been met and relies on the business purpose versus tax avoidance and material distortion of income arguments.
7. Sec. 1.461-1. General rule for taxable year of deduction. (a) General rule-- (1) Taxpayer using cash receipts and disbursements method. Under the cash receipts and disbursements method of accounting, amounts representing allowable deductions shall, as a general rule, be taken into account for the taxable year in which paid. Further, a taxpayer using this method may also be entitled to certain deductions in the computation of taxable income which do not involve cash disbursements during the taxable year, such as the deductions for depreciation, depletion, and losses under sections 167, 611, and 165, respectively. If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made. An example is an expenditure for the construction of improvements by the lessee on leased property where the estimated life of the improvements is in excess of the remaining period of the lease. In such a case, in lieu of the allowance for depreciation provided by section 167, the basis shall be amortized ratably over the remaining period of the lease. See section 178 and the regulations thereunder for rules governing the effect to be given renewal options in determining whether the useful life of the improvements exceeds the remaining term of the lease where a lessee begins improvements on leased property after July 28, 1958, other than improvements which on such date and at all times thereafter the lessee was under as binding legal obligation to make. See section 263 and the regulations thereunder for rules relating to capital expenditures.↩
8. In Van Raden v. Commissioner, 71 T.C. 1083 (1979), the Court rejected the taxpayer's argument that the discretionary power described in sec. 446(b) is not available to the Commissioner when dealing with farmers who use the cash method of accounting. Petitioner in the instant case had made the same argument, and we adhere to the views expressed in Van Raden. Accord Clement v. United States, 580 F. 2d 422, 427 (Ct. Cl. 1978), cert. denied 440 U.S. 907 (1979). See also Sandor v. Commissioner, 62 T.C. 469 (1974), affd. per curiam 536 F. 2d 874↩ (9th Cir. 1976).
9. This argument was also rejected in Haynes v. Commissioner, T.C. Memo. 1979-240, which found Van Raden↩ controlling.