SUE B. PACKARD, A.K.A. VIRGINIA S. WAINWRIGHT,
PETITIONER V. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

RICHARD A. WAINWRIGHT, PETITIONER V. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 23163–82, 24088–82.    Filed September 5, 1985.

*Sherin V. Reynolds*, for the petitioner in docket No. 23163–82.

*Kenneth B. Weckstein,* for the petitioner in docket No. 24088–82.

*Cynthia J. Mattson,* for the respondent.

COHEN, *Judge*: In these consolidated cases, respondent determined deficiencies in Federal income tax of petitioners as follows:

| Petitioner/docket No. | Taxable year | Amount |
| --- | --- | --- |
| Sue B. Packard (a.k.a. | 1971 | $207,421.00 |
| Virginia S. Wainwright) | FYE 2/1/72 | [1]157,282.24 |
| Docket No. 23163–82 | 1972 | 226,724.00 |
| | 1975 | 3,193.71 |
| Richard A. Wainwright | 1971 | 207,421.00 |
| Docket No. 24088–82 | 1972 | 226,724.00 |
| | 1975 | 10,766.19 |

After concessions, we must decide the correct tax treatment of petitioners' investment in a cattle-feeding operation. Respondent claims that the total program was a sham, disputes the deductibility of a prepayment for feed, and attacks the use of a subchapter S corporation and a partnership formed by petitioners in order to defer the reporting of gains through an installment sale under section 453[2] and to secure additional deductions through a subsequent liquidation of the corporation. Finally, petitioner Wainwright claims a net operating loss resulting from an alleged theft of partnership funds by petitioner Packard.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by reference.

Petitioners Richard S. Wainwright (Wainwright) and Sue B. Packard (Packard), also known as Virginia S. Wainwright, were husband and wife during taxable years 1971 and 1972 and filed joint Federal income tax returns for those years. Petitioners were divorced in December 1973, and filed separate returns for 1973, 1974, and 1975. Petitioners filed their

---

[1]Respondent has conceded the deficiency of $157,282.24 for fiscal year ending Feb. 1, 1972, against petitioner Packard as transferee of the assets of Queen Feeding & Livestock Co.

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

income tax returns for taxable years 1971 through 1975 using the cash method of accounting. Wainwright resided in Silver Spring, Maryland, and Packard resided in Boca Raton, Florida, when they filed their respective petitions in these cases.

On December 10, 1971, petitioners received a liquidating distribution from an electronics company that they founded in 1962. Wainwright, an electrical engineer, had managed the technical aspects of the company, while Packard had managed the financial affairs of the company and the family. Petitioners reported the liquidating distribution on their 1971 return as long-term capital gain of $735,961, which resulted in additional taxable income to them of $365,480.

In late 1971, petitioners explored investment possibilities in cattle feeding. Petitioners discussed an investment in cattle feeding with their attorneys, Arthur Schneck (Schneck) and Martin Todtman (Todtman). Although petitioners had invested previously in oil, stocks, bonds, and real estate, they had no experience in the cattle business.

An investment opportunity in a cattle-feeding program was made available to petitioners by Cornwall Investment Corp. (Cornwall). Although Cornwall's involvement in cattle feeding was primarily for its own account, it also offered the program to a limited number of clients, friends, and other individuals with whom it was associated. Petitioners had no prior association with Cornwall. The program was made available to petitioners, however, after preliminary discussions in late 1971 among Schneck and Todtman and Martin Blackman (Blackman), one of the principals of Cornwall. Petitioners did not participate in the preliminary discussions and neither met nor spoke with anyone from Cornwall until they met in Blackman's New York City office on December 17, 1971, to discuss further and finalize the transaction. Blackman, a tax attorney, had been involved in the cattle-feeding business since the early 1960's.

In general, the Cornwall program offered to petitioners called for the feeding of the cattle in three rounds over approximately 12 months, with one-third of the cattle contracted to be purchased and fed at one time. The use of three rounds of feeding minimized risks attributable to such factors as weather, disease, and market. Under the program, an investor would enter into a feeding contract with a local feed

yard, usually Zimmerman Feed Yards, Inc. (Zimmerman), of Springfield, Nebraska. Zimmerman contracted with other feed yards to feed the cattle if it lacked sufficient space in its own feed yards. J.P. Latham (Latham) was president of Zimmerman. Latham and his wife were primarily responsible for the daily feeding of the cattle, and in consultation with personnel of Cornwall, for decisions relating to the purchase and sale of the cattle. Cornwall and Latham charged management and supervision fees, respectively, for their services. Under the Cornwall program, financing and other banking services were provided to investors by Omaha National Bank (ONB) of Omaha, Nebraska, of which Latham and Zimmerman had been long-standing customers.

Petitioners, Blackman, Robert Tanenbaum (Tanenbaum), also a principal of Cornwall, Schneck, and Todtman were present at the December 17, 1971, meeting. At the meeting, Blackman explained to petitioners the nature of the cattle-feeding business, the proposed transaction, its prospects for profit or loss, and the likely tax consequences. No written explanation of the Cornwall cattle-feeding program was made available to petitioners or other participants in the program. Petitioners received no written explanation of the economic results from previous Cornwall transactions.

The participants at the December 17 meeting discussed the purchase by Packard of the stock of a subchapter S corporation, the prepayment of feed by the corporation, and the resulting tax deduction to petitioners in the year of purchase for the amount of the prepaid feed expense. Petitioners were advised at the meeting that expenses such as labor and insurance were deductible in the year such expenses were incurred, and that the cost of cattle was a capital item. The participants also discussed the possibility of an installment sale in the following year of the stock of the subchapter S corporation and the subsequent liquidation of the corporation's assets into a partnership that could be formed by both petitioners to proceed with the cattle-feeding operations. Petitioners were advised of the tax consequences of an installment sale election under section 453.

## Formation of Queen Feeding & Livestock Co.

At the December 17, 1971, meeting, and in accordance with the discussions during that meeting, Packard purchased, for $350,000, 1,000 shares of common stock of Queen Feeding & Livestock Co. (Queen), a Delaware corporation organized on December 14, 1971. Queen's stated purpose was to engage in feeding livestock.

Although Packard was the sole shareholder of Queen, petitioners considered the investment in the cattle-feeding program a joint investment.

Packard paid for the Queen stock in part with two checks totaling $140,000 from an account held jointly with Wainwright at Suburban Trust Co. of Wheaton, Maryland. Packard paid the balance of the purchase price with a $210,000 check dated December 17, 1971, drawn from a new account at ONB.

The source of the funds in the ONB account was a loan to Packard from ONB arranged by Cornwall and Zimmerman. The loan was evidenced by a demand note executed by Packard, dated December 17, 1971, in the principal amount of $210,000, with interest at a rate of 7¾ percent per annum. The note was presented to Packard by Blackman and signed in his office during the December 17, 1971, meeting. The note contained the following provision regarding collateral:

3. To secure the payment of this note and all other indebtedness or liability, direct or indirect, joint or several, absolute or contingent, now existing or hereafter acquired or contracted, of Borrower to Bank (hereinafter collectively designated "Obligations"), whether such Obligations are created directly or acquired by Bank by assignment or otherwise, Borrower hereby pledges to Bank and grants to Bank a security interest under the Uniform Commercial Code in the following described property (hereinafter collectively designated "Collateral") [Blank lines] and all property listed on the back hereof and all other property now or hereafter in the possession or control of Bank. Borrower agrees to deliver to the holder, immediately upon demand, additional Collateral should the holder deem itself insecure.

No specific property was designated as collateral on the face or the reverse of the note. Packard was personally liable for repayment of the note.

Prior to obtaining the loan, neither Packard nor Wainwright had financial dealings with ONB. Petitioners submitted no financial statements and had no direct contacts with ONB in obtaining the loan. The financing arrangement with ONB was

available to all participants in the Cornwall program and consisted of the following transactions: ONB loaned to the investor 60 percent of the amount required for the purchase of feed; the bank loan was evidenced by a recourse note executed by the investor; proceeds of the loan and the balance of the amount to be invested in the cattle-feeding program were deposited into an account opened for the investor at ONB; thereafter, a check was drawn from the ONB account payable to the feed yard for the feed payment; the feed yard then purchased a time certificate of deposit in an amount equal to the loan and pledged the certificate of deposit as collateral for the loan. Under the arrangement, ONB agreed that the interest rate on the loan to the investor would be 4 percent over the amount being earned on the certificate of deposit pledged by the feed yard. ONB required a pledge of cattle and feed to finance the transaction.

During the years of petitioners' participation in the Cornwall program, 1971 through 1973, Marvin Rohn (Rohn) was an agricultural loan officer of ONB. Rohn was employed by ONB from 1961 to 1981. Rohn assisted David Johnson, a vice president of ONB.

On December 17, 1971, Packard consented to the election of Blackman as sole director of Queen and the corporation's adoption of a plan to issue section 1244 stock. Also on that date, Packard consented to Queen's election to be taxed as a small business corporation. By corporate resolution dated December 17, 1971, an account for Queen at ONB was authorized, and Blackman was elected president of Queen. The three checks written by Packard totaling $350,000 for the purchase of the Queen stock were transmitted by Blackman to Rohn and deposited in Queen's account at ONB. All documents dated December 17, 1971, were signed in Blackman's office the same date.

Queen obtained authorization to transact business in the State of Nebraska by application dated December 23, 1971. Latham was appointed Queen's registered agent in Nebraska.

As president of Queen, Blackman executed contracts and documents relating to the cattle transactions. Tanenbaum acted as accountant for Queen and maintained its checkbook.

In accordance with the discussions at the December 17, 1971, meeting, Queen entered into a written cattle-feeding

agreement with Zimmerman. Under the terms of the agreement dated December 23, 1971, Zimmerman agreed to purchase for Queen approximately 5,235 head of cattle for an aggregate purchase price not to exceed $1,675,200. The agreement provided for delivery of the cattle at Zimmerman's feed yards in Springfield, Nebraska, to commence on December 23, 1971, and to be completed by November 1, 1972. With respect to feed, the agreement contained the following provision:

(1) Owner hereby delivers feed to Feeder, and Feeder acknowledges receipt hereof of feed having a fair market value of $341,213.14 of the kind, quantity and quality evidenced by bona fide bill of sale attached hereto and marked Exhibit 1.

The feeding agreement fixed the price of feed. Under the terms of the agreement, a $8,750 downpayment was required on the cattle purchase, and a note and chattel mortgage for the balance of the purchase price was to be executed by Queen upon completion of the cattle purchase by Zimmerman. The note and chattel mortgage provided for payment of the balance of the purchase price of cattle out of the proceeds of the sale of cattle whenever sold, with no liability on the part of Queen beyond the proceeds of the sale of the cattle covered by the note and chattel mortgage. The agreement did not require prepayment of charges such as labor, veterinary fees, insurance, freight, and other operating costs. Under the agreement, proceeds of cattle sales would be distributed as follows:

out of total net proceeds of sale, Feeder first shall be entitled to unpaid bills owing by Owner to Feeder, if any, under this agreement, and then to discharge the note and chattel mortgage * * * and thereafter to distribute to Owner the balance thereof.

Any unconsumed feed would be returned to Queen under the terms of the agreement. The agreement further provided that the agreement, note, and chattel mortgage were to be assigned by Zimmerman to ONB.

Two checks dated December 23, 1971, were drawn from Queen's account at ONB to the order of Zimmerman for the downpayment for cattle and for the feed payment in the amounts of $8,750 and $341,213.14, respectively, and were forwarded on that date by Blackman to Mr. and Mrs. Latham. These checks were paid by ONB on December 28, 1971.

The December 23, 1971, bill of sale for feed called for the following amounts of feed to be used in Queen's cattle-feeding operations:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 224,164 | bu | Corn | @ | $1.15 | bu | $257,788.60 | |
| 2,826,360 | lbs | Molasses hay | @ | 38.00 | ton | 53,700.84 | |
| 94,200 | lbs | Prairie hay | @ | 31.00 | ton | 1,460.10 | |
| 628,080 | lbs | Protein | @ | 90.00 | ton | 28,263.00 | [sic] |
| | | | | | | 341,213.14 | |

No cattle were purchased or fed in 1971 under the agreement between Queen and Zimmerman.

Approximately 75 percent of the amount of the feed purchase was allocated to corn. The monthly cash prices per bushel of No. 2 yellow corn on the Chicago grain market were as shown in table 1 on page 405; the monthly cash prices per bushel of No. 2 yellow corn on the Omaha grain market were as shown in table 2 on page 406.

The amount of feed purchased by Queen was based on petitioners' $350,000 investment in Queen stock, less the minimal downpayment on the cattle. Factors entering into the decision to have Queen purchase the feed in December 1971 included: ability to fix the price of feed for the entire feeding cycle, to assure adequate feed for the number of head of cattle to be fed over the next 12 months, to reserve feedlot space, and to enable petitioners to leverage the transaction.

On December 28, 1971, Zimmerman purchased a $210,000 time certificate of deposit, due October 30, 1972, at 3.75-percent interest, and pledged it as collateral for the $210,000 loan from ONB to Packard. ONB would not have made the loan to Packard without the certificate of deposit pledged by Zimmerman as collateral.

Queen filed a Form 1120S, U.S. Small Business Corporation Income Tax Return for the year December 14, 1971, through December 31, 1971, using the cash method of accounting. On its 1971 return, Queen reported no income and claimed deductions for feed purchased and taxes in amounts of $341,213 and $10, respectively. Queen reported its loss of $341,223 distributable to Packard, its sole shareholder.

On their 1971 joint return, Wainwright and Packard reported a total loss of $341,223 from Queen.

TABLE 1

CASH PRICES FOR CORN NO. 2 YELLOW - CHICAGO
(per bushel)

| Year beginning | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1945 | 118 | 118 | 118 | 118 | 118 | 121 | 121 | 139 | 145 | 218 | 194 | 191 | 143 |
| 1946 | 188 | 143 | 137 | 135 | 142 | 171 | 180 | 184 | 212 | 218 | 242 | 253 | 184 |
| 1947 | 244 | 250 | 264 | 274 | 226 | 235 | 236 | 234 | 234 | 215 | 200 | 188 | 233 |
| 1948 | 157 | 143 | 146 | 145 | 131 | 136 | 140 | 138 | 138 | 142 | 132 | 133 | 140 |
| 1949 | 125 | 117 | 133 | 132 | 134 | 137 | 145 | 151 | 150 | 157 | 155 | 155 | 141 |
| 1950 | 155 | 161 | 173 | 178 | 184 | 180 | 182 | 180 | 174 | 178 | 181 | 182 | 170 |
| 1951 | 181 | 186 | 196 | 195 | 185 | 184 | 184 | 186 | 184 | 183 | 183 | 178 | 185 |
| 1952 | 166 | 161 | 166 | 163 | 158 | 159 | 160 | 163 | 159 | 160 | 163 | 168 | 162 |
| 1953 | 149 | 149 | 158 | 157 | 157 | 158 | 158 | 161 | 163 | 163 | 164 | 165 | 159 |
| 1954 | 159 | 153 | 156 | 156 | 153 | 149 | 149 | 151 | 149 | 148 | 134 | 133 | 149 |
| 1955 | 125 | 121 | 129 | 128 | 130 | 135 | 150 | 154 | 156 | 158 | 160 | 161 | 142 |
| 1956 | 135 | 137 | 138 | 137 | 130 | 131 | 132 | 134 | 133 | 135 | 132 | 127 | 133 |
| 1957 | 121 | 119 | 119 | 115 | 116 | 119 | 130 | 134 | 137 | 136 | 136 | 128 | 126 |
| 1958 | 121 | 115 | 119 | 119 | 119 | 123 | 130 | 130 | 131 | 128 | 128 | 122 | 124 |
| 1959 | 115 | 113 | 112 | 117 | 115 | 117 | 122 | 123 | 122 | 121 | 120 | 117 | 118 |
| 1960 | 110 | 99 | 105 | 112 | 115 | 114 | 111 | 115 | 114 | 115 | 114 | 112 | 111 |
| 1961 | 112 | 112 | 111 | 109 | 110 | 112 | 114 | 117 | 115 | 114 | 111 | 113 | 112 |
| 1962 | 113 | 110 | 116 | 120 | 121 | 122 | 121 | 124 | 131 | 133 | 133 | 136 | 123 |
| 1963 | 124 | 117 | 123 | 124 | 122 | 124 | 126 | 129 | 127 | 124 | 126 | 129 | 125 |
| 1964 | 123 | 120 | 127 | 129 | 131 | 133 | 135 | 138 | 137 | 133 | 131 | 132 | 131 |
| 1965 | 123 | 116 | 124 | 132 | 131 | 128 | 128 | 131 | 133 | 143 | 149 | 146 | 132 |
| 1966 | 140 | 135 | 145 | 142 | 141 | 141 | 138 | 139 | 138 | 131 | 123 | 120 | 136 |
| 1967 | 117 | 110 | 114 | 113 | 115 | 117 | 116 | 119 | 115 | 113 | 108 | 109 | 114 |
| 1968 | 109 | 115 | 116 | 120 | 118 | 117 | 124 | 132 | 131 | 129 | 130 | 124 | 122 |
| 1969 | 121 | 118 | 119 | 126 | 126 | 124 | 128 | 132 | 137 | 138 | 146 | 152 | 131 |
| 1970 | 142 | 142 | 154 | 159 | 157 | 155 | 151 | 152 | 157 | 148 | 129 | 116 | 147 |
| 1971 | 110 | 107 | 122 | 122 | 121 | 126 | 126 | 128 | 125 | 129 | 129 | 140 | 124 |
| 1972 | 132 | 133 | 157 | 158 | 159 | 159 | 165 | 201 | 242 | 252 | 291 | 247 | 191 |
| 1973 | 237 | 250 | 268 | 290 | 313 | 299 | 269 | 270 | 293 | 335 | 363 | 355 | 295 |
| 1974 | 374 | 348 | 347 | 319 | 296 | 290 | 296 | 282 | 291 | 295 | 311 | 299 | 312 |
| 1975 | 274 | 258 | 259 | 262 | 270 | 268 | 268 | 284 | 296 | 296 | 284 | 277 | 215 |
| 1976 | 249 | 233 | 244 | 253 | 254 | 252 | 250 | 241 | 227 | 205 | 178 | 180 | 230 |

TABLE 2

CASH PRICES FOR CORN No. 2 YELLOW - OMAHA

(per bushel)

| Year beginning Oct. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Average |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1964 | 123 | 123 | 127 | 127 | 128 | 130 | 132 | 130 | 129 | 128 | 123 | 123 | 127 |
| 1965 | 119 | 119 | 126 | 129 | 127 | 121 | 125 | 124 | 126 | 133 | 138 | 135 | 127 |
| 1966 | 133 | 134 | 136 | 133 | 131 | 131 | 127 | 130 | 131 | 128 | 118 | 116 | 129 |
| 1967 | 114 | 111 | 114 | 115 | 115 | 117 | 119 | 122 | 119 | 116 | 110 | 117 | 116 |
| 1968 | 118 | 118 | 117 | 120 | 119 | 121 | 125 | 129 | 126 | 123 | 122 | 117 | 121 |
| 1969 | 117 | 117 | 116 | 120 | 120 | 119 | 122 | 124 | 126 | 128 | 136 | 140 | 124 |
| 1970 | 134 | 134 | 143 | 146 | 146 | 144 | 143 | 145 | 148 | 141 | 124 | 115 | 139 |
| 1971 | 114 | 115 | 124 | 125 | 123 | 123 | 125 | 127 | 123 | 124 | 121 | 128 | 123 |
| 1972 | 128 | 134 | 149 | 156 | 155 | 149 | 151 | 184 | 225 | 232 | 271 | 237 | 180 |
| 1973 | 234 | 240 | 249 | 271 | 295 | 276 | 249 | 251 | 268 | 319 | 355 | 346 | 279 |
| 1974 | 363 | 346 | 336 | 307 | 279 | 275 | 285 | 281 | 284 | 292 | 312 | 295 | 305 |
| 1975 | 275 | 255 | 256 | 257 | 260 | 262 | 257 | 274 | 286 | | | | |

*Formation of D & S Investment Co.*

On January 12, 1972, petitioners, as general partners, organized D & S Investment Co. (D & S), a general partnership with a principal place of business in Springfield, Nebraska. Under the terms of the partnership agreement, petitioners were to share equally in profits and losses. The agreement provided further that "No Partner, without consent of all other partners, shall * * * [u]se the name, credit, or property of the Partnership for any purpose other than a proper Partnership purpose." The partnership agreement provided its construction and the rights and liabilities of the partners would be governed by Nebraska law. Petitioners each contributed to D & S separate demand notes, dated January 12, 1972, in amounts of $17,500. These notes were never paid.

As partners of D & S, petitioners on January 12, 1972, appointed Blackman as the partnership's general manager and approved the purchase by D & S of all of the Queen stock for $385,000 to be paid in 15 annual installments. Petitioners also approved the complete liquidation of Queen, the continuance of the cattle-feeding business by D & S after the liquidation of Queen, and the distribution of Queen's assets to the partnership.

Packard and D & S entered into an agreement dated February 1, 1972, for the sale of 1,000 shares of Queen stock for $385,000, to be paid in 15 annual installments, with interest on the unpaid balance at the rate of 5 percent per annum, payable annually. D & S gave Packard a note, dated February 1, 1972, consistent with the terms of the sale agreement, in amount of $385,000.

On February 1, 1972, D & S adopted a plan of complete liquidation of Queen. Also on that date, as a result of the liquidation, D & S received the assets and liabilities of Queen, including the feed valued at $341,213.14, the cost of which had been deducted by Queen in its preceding taxable year. D & S allocated the basis of the property it received from Queen pursuant to section 334(a) as follows:

| | |
|---|---|
| Feed.................................................. | $341,213.14 |
| Feeding contract ................................. | 35,000.00 |
| Miscellaneous ..................................... | 11.00 |
| Subtotal.............................................. | 376,224.19 [sic] |
| Other assets ....................................... | 8,750.00 |
| Cash:................................................. | 25.81 |
| Total ........................................... | 385,000.00 [sic] |

Queen filed Form 1120S for the taxable year January 1, 1972, through February 1, 1972, using the cash method of accounting, and reported no income or loss.

Of the participants in the Cornwall program during the 1971–73 feeding season, each of 14 participants, including petitioners, formed a subchapter S corporation, which was incorporated in Delaware and authorized to transact business in Nebraska. Each corporation entered into a cattle-feeding agreement dated December 23, 1971. Each corporation was subsequently liquidated after an installment sale of the stock to a related partnership.

## Cattle-Feeding Transactions

The purchase and feeding of cattle commenced on February 16, 1972, with the first round of feeding. The third round of feeding was completed on February 13, 1973. In the three rounds of feeding, a total of 4,888 feeder steers were purchased and fed, and of the feed purchased in December 1971, $304,102.09 of feed was consumed. The steers were fed for an average of 115 days and gained an average of 1.89 pounds per day. The cattle were sold from May 1972 through February 1973, for a total price of $1,974,214.24, to such firms as Iowa Beef, Armour, M.B.P., Beefland, and Hormel. The fattened cattle sold for an average price of 36 cents per pound. During the period in which D & S was in operation, the price of choice slaughter steers fluctuated 10 cents, from a low of 33 cents per pound in November 1972 to a high of 43 cents per pound in February 1973.

Other than the December 17, 1971, meeting, petitioners had no meetings or communications, in person, by telephone, or otherwise, with Blackman during the cattle-feeding operation. Packard conferred with Tanenbaum occasionally by telephone. Petitioners did not actively participate in the cattle-

feeding operation, but rather, they relied on Blackman and Tanenbaum, as well as their own attorneys, to manage their investment. Tanenbaum orally advised Todtman or Schneck of the results of each round of feeding as they became available. In turn, the attorneys advised petitioners by telephone of the timing of each round. Packard was not aware that she had suffered an economic loss on the investment until after the cattle-feeding operation had terminated.

The transactions in each round of feeding were as follows:

### Round One

On February 16, 1972, Zimmerman sold 1,606 head of cattle to D & S for $527,500.23. Of Queen's $8,750 downpayment for cattle, $3,000 was applied to this sale, resulting in a net purchase price of $524,500.23. D & S executed a nonrecourse note in favor of Zimmerman in the amount of $524,500.23, and a chattel mortgage pledging all cattle and feed as security for the note. A financing statement covering "livestock, feed, contract and contract rights" was filed with the county clerk, Sarpy County, Nebraska, on March 7, 1972.

During round one, $101,645.66 of feed was consumed. As a result of round one, Zimmerman reported cattle sales of $659,086.04. After expenses and the amount applied to the chattel mortgage, D & S received a distribution of $2,849.60 from Zimmerman. Zimmerman retained $107,926.06.

### Round Two

D & S purchased 1,295 head of cattle for $335,067.78, less $3,000 attributable to Queen's downpayment, for a net purchase price of $332,067.78 by bill of sale dated May 10, 1972. As in round one, D & S executed a nonrecourse note in the amount of the net purchase price, a chattel mortgage to secure the note, and a financing statement.

During round two, $88,363.10 of feed was consumed, cattle sales amounted to $435,560.68, and after expenses and the amount applied to the chattel mortgage, Zimmerman retained $78,105.45. D & S received no distribution from round two.

### Round Three

D & S purchased 1,987 head of cattle for $723,623.11, less $2,750 attributable to Queen's downpayment, for a net pur-

chase price of $720,873.11 by bill of sale dated October 24, 1972. As in the other rounds, D & S executed a nonrecourse note in the amount of the net purchase price, a chattel mortgage to secure the note, and a financing statement.

During round three, $114,093.33 of feed was consumed, cattle sales amounted to $879,567.52, and after expenses and the amount applied to the chattel mortgage, Zimmerman retained $120,463.73 and remitted $6,856.20 to D & S.

### *Post Cattle-Feeding Transactions*

The following amounts of feed were unconsumed and purchased from D & S by Zimmerman on February 13, 1973:

| | | | | | | |
|---|---|---|---|---|---|---|
| 25,160 | bu | Corn | @ | $1.18 | bu | $29,688.80 |
| 253,000 | lbs | Molasses hay | @ | 44.00 | ton | 5,566.00 |
| 41,250 | lbs | Protein | @ | 90.00 | ton | 1,856.25 |
| | | | | | | 37,111.05 |

A final remittance report dated February 13, 1973, was issued by Zimmerman to D & S summarizing the three rounds as follows:

| | |
|---|---|
| Amounts previously retained | $306,495.24 |
| Additional revenues and expenses: | |
| Veterinary supplies and services | (9,678.39) |
| Feed sold | 37,111.05 |
| Net remittance | 333,927.90 |

On February 13, 1973, Zimmerman issued to D & S a check in the amount of $333,927.90 for the net remittance, and a check in the amount of $833.24 for three crippled steers.

On February 14, 1973, the $6,856.20 check from round three and the final remittance check for $333,927.90 from Zimmerman were deposited into the checking account of D & S at ONB. The following disbursements were made from the D & S account by checks dated February 14, 1973:

$42,000 to Cornwall for its management fee;
$19,250 to Packard for payment of interest from February 1, 1972, to February 1, 1973, on the installment note;
$25,666.67 to Packard for payment of principal on the installment note;
$256,596.84 to D & S.

Upon instruction from Todtman, Tanenbaum advised ONB to transfer $256,596.84 from the D & S account at ONB to a D & S

account at Chemical Bank of New York (Chemical Bank). The $256,596.84 check was deposited into D & S account number 020098618 at Chemical Bank. Although that amount was initially credited to the D & S Chemical Bank account in April 1973, the credit was subsequently reversed due to a stop payment on the check by ONB. No further deposits were made in the D & S Chemical Bank account.

Packard paid the principal and interest on the loan at ONB by two checks dated March 6, 1973, in amounts of $210,000 and $19,663.76, respectively, from her personal account at Chemical Bank (number 020313691). The check for the interest was paid on March 8, 1973. The check for the principal was not paid until May 2, 1973.

On May 1, 1973, $256,596.84 was transferred by wire to Packard's personal account at Chemical Bank (number 020313691). The release of $256,596.84 from the D & S account at ONB came after the $210,000 loan was paid by Packard.

Although Wainwright made repeated inquiries about the transfer of the D & S funds into Packard's personal account, the $256,596.84 was never deposited in the D & S account at Chemical Bank.

By letter to Packard dated February 28, 1973, Tanenbaum advised that the sale of the partnership's cattle was complete and that "due to weather conditions affecting the weight gain and price of cattle, the results this year were not as good as the results last year." He summarized the economic and tax results of petitioners' cattle transactions as follows:

| | |
|---|---|
| Total invested | $350,000.00 |
| Net proceeds | 301,613.51 |
| Net cattle loss | 48,386.49 |

The loss included the $42,000 management fee paid to Cornwall. The letter also set forth the following income tax consequences of petitioners' investment: 1971 subchapter S loss of $341,223, and 1972 and 1973 partnership losses of $33,879 and $49,507, respectively, resulting in total available ordinary deductions of $424,609. Tanenbaum further advised Packard that the gain on the sale of the Queen stock to D & S was reportable as ordinary gain in 15 equal installments of $25,082 for each year from 1973 through 1987. In addition, the letter included projections of net gain from the investment

based on tax brackets of 50, 60, and 70 percent. Prior to that correspondence, no written results of the D & S cattle-feeding operations were communicated to petitioners.

D & S filed its partnership returns for 1972 and 1973 using the cash method of accounting. On its U.S. Partnership Return of Income (Form 1065) for the taxable year 1972, D & S reported a net loss of $33,879, distributable equally to petitioners. The net loss claimed for 1972 resulted from transactions in rounds one and two as follows:

| | | |
|---|---:|---:|
| Cattle sales | | $1,094,647 |
| Costs: | | |
| Cattle: | | |
| Round one | $527,500.23 | |
| Round two | 335,067.78 | |
| Feed: | | |
| Round one | 101,645.66 | |
| Round two | 88,363.10 | |
| Pro rata allocation of $35,000 | | |
| purchase price | 26,745.00 | |
| | 1,079,322.00 | |
| Labor | 25,468.00 | |
| Interest | 22,428.00 | |
| Miscellaneous | 1,308.00 | 1,128,526 |
| | | (33,879) |

On Schedule L of its 1972 return, D & S showed assets as of the end of the taxable year as follows:

| | | |
|---|---:|---:|
| Cash | | $2,869 |
| Inventories | | 821,767 |
| Other current assets: | | |
| Due from feeder | $186,032 | |
| Notes receivable | 35,000 | |
| Feed received in liquidation | 61,326 | 282,358 |
| Total assets | | 1,106,994 |

On their joint return for 1972, petitioners reported their distributive shares of the 1972 loss claimed by D & S. Petitioners elected to report the income realized on the sale of the Queen stock on an installment basis under section 453, and reported that no payments were received in the year of sale (1972).

On its Form 1065 for 1973, D & S reported a net loss of $68,762, distributable equally to petitioners. The claimed net loss resulted from transactions in round three as follows:

| | | |
|---|---:|---:|
| Cattle sales | | $879,567 |
| Costs: | | |
| Cattle: | | |
| Round three | $723,623.11 | |
| Feed: | | |
| Round three | 114,093.33 | |
| Remainder of original | | |
| amount of feed | 37,121.56 | |
| Pro rata allocation of $35,000 | | |
| purchase price | 8,255.00 | |
| | 883,093.00 | |
| Labor | 14,111.00 | |
| Interest | 14,254.00 | |
| Vet | 9,678.00 | |
| Miscellaneous | 3,049.00 | |
| Management fee | 42,000.00 | 966,185 |
| Sale of feed | | 37,111 |
| | | (49,507) |
| Interest on installment note | | 19,255 |
| | | (68,762) |

On their individual income tax returns for 1973, petitioners each deducted $34,381 as his or her share of the loss claimed by D & S for the taxable year 1973.

On her 1973 individual income tax return, Packard reported income of $25,082 from the installment sale of Queen stock to D & S. Packard failed to report the $19,250 interest payment she received from D & S on the installment note, for which D & S claimed a deduction on its 1973 return. Packard claimed a deduction of $19,664 for interest paid on the $210,000 ONB loan.

Subsequent to 1973, no further payments were made by D & S on the installment sale and neither Packard nor Wainwright reported income from the sale for Federal income tax purposes.

Wainwright filed an amended return for 1973 carrying back a loss of $128,298, which he reported was produced by the transfer of D & S funds in the amount of $256,596.84 to Packard's personal account.

In his statutory notices of deficiency, respondent disallowed petitioners' claimed distributive share of the Queen loss for 1971 to the extent of the $341,213 prepaid feed deduction on the grounds that there was no business purpose for the prepayment and the deduction resulted in a material distortion of income. As an alternative position, respondent deter-

mined that petitioners recognized short-term capital gain of $341,213 as a result of the liquidation of Queen after the transfer of the Queen stock to D & S, which was actually a contribution to capital under section 721.

Respondent further determined that the cost of cattle sold by D & S during 1972 was $26,745 less than the amount shown on its return, and, accordingly, disallowed petitioners' claimed distributive shares of the D & S loss to that extent. Respondent also made an automatic medical expense adjustment.

Respondent has not determined a deficiency for either petitioner for 1973 because of the bar of the statute of limitations.[3]

OPINION

The issues in this case concern the deductions, if any, to which petitioners are entitled from their investment through Queen and D & S in the Cornwall cattle-feeding program. Respondent challenges petitioners' loss deductions on numerous grounds. Respondent's primary position is that the transactions lacked economic substance, were entered into solely for tax avoidance, and should be disregarded in their entirety for Federal income tax purposes as shams. Respondent also argues that the transactions were implemented pursuant to a preconceived plan, the steps of which should be integrated for tax purposes. Alternatively, respondent argues that the prepaid feed deduction resulted in a material distortion of income and that the purported installment sale of the Queen stock was in reality a contribution to the capital of D & S. Respondent's other arguments include his contention that the transactions entered into by Queen and D & S were not activities engaged in primarily for profit, and his position that the prepaid feed deduction should be disallowed to the extent of $210,000 (the amount of the loan to Packard from ONB) because there was no payment of this amount by a cash-basis taxpayer. Finally, if we determine that the prepaid feed expense was allowable in full for 1971, respondent asserts the alternative position that the purported sale of the Queen stock was in reality a contribution to the capital of D & S, and that

---

[3]Obviously this fact cannot affect our decision. It is set forth only for completeness.

the liquidation of Queen resulted in short-term capital gain to petitioners of $341,213 in 1972.

Petitioners assert that the transactions were bona fide, had economic substance, were entered into with a reasonable objective for profit, and, accordingly, should be respected for tax purposes.

The final issue deals with Wainwright's claim that the transfer of funds from the D & S account to the personal account of Packard constituted a theft, and as such, he is entitled to carry back and carry over his share of the resulting net operating loss incurred by D & S in 1973.

## 1. Sham-Transaction Theory

Petitioners were faced with a substantial tax liability upon the liquidation of their electronics company in late 1971. Within weeks of the liquidation and in the last 2 weeks of 1971, petitioners invested in a cattle-feeding program that generated tax losses that essentially eliminated the additional income derived from the unrelated capital gain. Respondent contends that the coincidence in amount of taxable gain and acquired deduction and the lack of economic substance to the cattle-feeding operation compel the conclusion that the entire program was a sham that must be disregarded for tax purposes.

The investment device chosen by petitioners centered around the special tax treatment afforded to farmers with regard to tax accounting for farm expenditures.[4] Farmers are given the option of using either the cash or inventory method of accounting under section 1.471–6(a), Income Tax Regs.[5] In conjunction with section 162, which allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, farmers are permitted to deduct as necessary expenses all amounts actual-

---

[4]No contention is made that petitioners are not "farmers" under sec. 1.471–6(a) or 1.162–12(a), Income Tax Regs.

The changes made by Congress under the Tax Reform Acts of 1976 and 1984 with regard to farming syndicates are not applicable to the years in issue. See Tax Reform Act of 1976, Pub. L. 94–455, sec. 207, 90 Stat. 1536; Tax Reform Act of 1984, Pub. L. 98–369, sec. 91, 98 Stat. 494, 601.

[5]Sec. 1.471–6(a), Income Tax Regs., provides in part:

(a) A farmer may make his return upon an inventory method instead of the cash receipts and disbursements method. It is optional with the taxpayer which of these methods of accounting is used * * *

ly expended in carrying on the business of farming, including the purchase of feed and other costs connected with raising livestock. Sec. 1.162–12(a), Income Tax Regs.[6] These special privileges have been recognized by the Supreme Court as an historical concession for farmers:

The sacrifice in accounting accuracy under the cash method represents an historical concession by the Secretary and the Commissioner to provide a unitary and expedient bookkeeping system for farmers and ranchers in need of a simplified accounting procedure. [*United States v. Catto*, 384 U.S. 102, 116 (1966).]

Petitioners had no prior experience in the cattle-feeding business and they were not actively involved in the program in which they chose to invest. The substantial tax benefits were without doubt a motivating factor in petitioners' decision to engage in the transactions as structured by the promoters of the Cornwall program. Thus, these circumstances justify careful scrutiny of the arrangements that were employed and the manner in which those arrangements were implemented in our assessment of the economic substance of the transactions in issue. *Owens v. Commissioner*, 64 T.C. 1, 16–17 (1975), affd. in part and revd. in part 568 F.2d 1233 (6th Cir. 1977).

Artifices that are engaged in solely for favorable tax consequences and are devoid of economic substance have been disregarded by the courts, in appropriate circumstances, under the sham transaction doctrine. See, e.g., *Knetsch v. United States*, 364 U.S. 361 (1960); *Moore v. Commissioner*, 85 T.C. 72 (1985); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981); *Derr v. Commissioner*, 77 T.C. 708 (1981).

In *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), the Supreme Court examined the problem of allocating depreciation deductions in a sale-leaseback case, approved the transaction as structured, and articulated the following test to determine whether a transaction is, for tax purposes, a sham:

Where * * * there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory

---

[6]Sec. 1.162–12(a), Income Tax Regs., provides in pertinent part:

(a) *Farms engaged in for profit.* A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. * * * The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay * * *

realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. [435 U.S. at 583–584.]

As the test was restated in *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983), in order to treat a transaction as a sham,

the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists. [Citations omitted.]

The first prong of the sham inquiry, the business purpose inquiry, is a subjective test and simply concerns the motives of the taxpayer in entering the transaction. *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d at 92; see *Knetsch v. United States*, 364 U.S. 361 (1960). A taxpayer's failure to establish that a transaction was motivated by a business purpose rather than by tax avoidance is not conclusive, however, that the transaction was a sham. Rather, if an objective analysis of the transaction indicates that a reasonable possibility of profit existed apart from tax benefits, the transaction will not be classified as a sham. *Frank Lyon Co. v. United States*, 435 U.S. at 583–584; *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 203 & n. 17.

Undoubtedly the obvious tax shelter potential was a motivating factor in petitioners' decision to participate in the cattle-feeding program. We are not convinced, however, that the transactions were not also motivated by a business purpose. Petitioners had received substantial funds from the sale of their business, and their testimony that they were looking for a means of investing those funds so as to preserve or enhance them is credible.

Irrespective of petitioners' subjective motivation for entering into the transaction, if we find that the underlying transaction was supported by economic substance, we will not disregard it as a sham. See *Frank Lyon Co. v. United States*, 435 U.S. at 583–584; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d at 92.

The precise degree of business motive or economic substance that must be present in a transaction for tax recognition is not clearly defined. *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 202. As we noted in *Rice's Toyota World*, however, the presence of a genuine indebtedness supported by an actual investment is strong evidence of economic substance. 81 T.C. at 202.

In the instant case, petitioners made an actual cash investment of $140,000. Packard also executed a $210,000 recourse note. D & S purchased and fed 4,888 feeder steers, which were sold for a total purchase price of $1,974,214.24.

This is not a case where there was no way in which petitioners could have benefited economically from the transaction. Cf. *Rice's Toyota World, Inc. v. Commissioner, supra; Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981). The parties stipulated that the price of choice slaughter steers fluctuated 10 cents during the period in which D & S was in operation—from a low of 33 cents per pound in November 1972 to a high of 43 cents per pound in February 1973. The fattened cattle sold for an average price of 36 cents per pound. Tanenbaum testified that the D & S cattle-feeding operation would have shown a profit if the beef had sold for 1 cent more per pound. Tanenbaum also testified that the cattle-feeding business had been profitable overall in the previous year and that there had been no reason to believe it would not also be profitable in the subsequent year. Blackman, a veteran of 10 years in the cattle-feeding business, testified at length regarding the factors that affect profitability in that business:

A. Well, profitability is effected, obviously, by the price at which feed is purchased, price at which cattle is purchased, the price at which feed is sold. The variables come in due to factors of weather and there's a great variety of weather factors.

You have—in the winter, you have the frost and snow which is a hazard to the cattle. You have the thaws which convert the cattle feed lots in effect into seas of mud in which it's very difficult for the cattle to gain weight because they slush around in the mud. And that was a factor in one of these cycles.

You have the summer weather. You have conditions of severe heat and drought that are adverse. Of course, you can have the favorable weather also. You also have the supply and demand factor as to how many other ranges and feed lots have animals on the hoof. You have the factors of disease.

You have the factor of international politics. If there is grain sale to—a new grain sale or additional competition in the grain market that will effect the price of feed and the price of cattle. You have the profit factor of the extent of which foreign cattle is being imported into the country.

You have factors of domestic politics. At one period, we had a factor of price control which I think just followed these cycles that the Wainwrights were in.

Blackman testified that the variables were discussed when petitioners were contemplating their entry into the program.

On the evidence in this case and under the applicable authorities, we do not conclude that petitioners' cattle-feeding program was a sham for tax purposes.

## 2. Step-Transaction Theory

Although we have determined that the transactions were not shaped solely by tax-avoidance considerations, and have not been shown to be shams, we must still determine whether the form in which the transactions were cast was inconsistent with their true nature. "To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945). See *Gregory v. Helvering*, 293 U.S. 465 (1935).

Respondent takes the position that the formation of Queen, the prepayment of feed by Queen, the formation of D & S, and the purported installment sale of Queen stock to D & S, followed by the immediate liquidation of Queen, were preconceived steps in a single plan of action. Respondent asserts that "there was no purpose for the creation of Queen other than to set the stage for the installment sale that would give rise to the 15-year deferral," and that there was no business purpose for the prepayment of feed. Thus he asks us to apply the step-transaction doctrine to disregard the creation of Queen and all steps taken by Queen, including the prepayment of feed and the installment sale, and to recognize D & S as the entity actually conducting the feeding operation, so as to disallow the entire subchapter S loss in 1971 and collapse the transaction into 1972 and 1973 when the actual feeding took place.

Although we agree that application of the step-transaction doctrine is proper in this case, our application does not produce the result outlined by respondent.

Where an interrelated series of steps are taken pursuant to a plan to achieve an intended result, the tax consequences are to be determined not by viewing each step in isolation, but by considering all of them as an integrated whole. See *D'Angelo Associates, Inc. v. Commissioner*, 70 T.C. 121, 129 (1978); *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 658 (5th Cir. 1968); *Atlee v. Commissioner*, 67 T.C. 395 (1976); *King Enterprises, Inc. v. United States*, 189 Ct. Cl. 466, 418 F.2d 511, 516 (1969). As the Supreme Court cautioned in *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938): "A given result at the end of a straight path is not made a different result because reached by following a devious path."

The twisted path followed by petitioners took them through a series of closely related steps that culminated in the formation of a general partnership in whose name the feeding operation was actually conducted. These events occurred within an interval of less than 2 months. Packard purchased the Queen stock on December 17, 1971. Queen entered into the cattle-feeding agreement with Zimmerman and purchased feed on December 23, 1971. Queen conducted no other activities during its existence. On January 12, 1972, petitioners organized D & S. On February 1, 1972, Packard and D & S entered into the agreement for the purported installment sale of the Queen stock, which terminated Queen's status as a small business corporation. Also on February 1, 1972, D & S adopted a plan for the liquidation of Queen, and D & S received the assets and liabilities of Queen. The purchase and feeding of cattle did not commence until February 16, 1972.

Blackman testified that the participants at the December 17, 1971, meeting discussed the "possibility" of the formation in the following year of a partnership that could purchase the Queen stock through an installment sale, liquidate the corporation and receive its assets, and then proceed with the cattle-feeding operations. On the record before us, the series of events outlined by Blackman at the December 17, 1971, meeting, and actually carried out by petitioners, who had no subsequent meetings with any of the Cornwall personnel, seems more than a "possibility." We are convinced that the

intent from the outset was to conduct the cattle-feeding operation in the partnership form. Indeed, this was the end result—no cattle were purchased or fed until after Queen had been liquidated and its assets distributed to D & S. The fact that the other participants in the program during the years of petitioners' participation commonly engaged in identically structured transactions lends further support to our conclusion that the structure of the cattle-feeding operation was carried out pursuant to a preconceived plan developed by the Cornwall promoters.

Petitioners presented no evidence of a valid business reason for entry into the transaction via the subchapter S structure and conducting the actual feeding operations in the partnership form upon immediate liquidation of the subchapter S corporation. Wainwright testified that the decision to form D & S in early 1972 was made because "someone suggested that a partnership was a proper form for a business transaction." He could not recall at trial who presented the partnership documents to him for signature, nor where they were executed. Packard testified that Schneck and Todtman advised petitioners to form the partnership and that the documents were sent to petitioners by their attorneys in January 1972. At trial, Wainwright stated: "D & S was to be a vehicle for investments and we were to purchase the stock in Queen as a first business operation. We have substantial other businesses which could have been incorporated within that framework." Such general testimony does not establish a business reason for the formation of the formally discrete steps taken by petitioners.

On the basis of the record before us and the inferences to be drawn therefrom, we conclude that Queen was formed as a vehicle through which petitioners hoped to achieve significant tax advantages. Initially, petitioners seized upon the liberal tax accounting treatment made available to farmers for prepaid feed expenses. By consenting to Queen's election to be treated as a small business corporation, Packard insured that the loss incurred by Queen for the prepayment of feed would be passed through to her as the corporation's sole shareholder, and as such, would offset other unrelated income. Under the guise of an installment sale, petitioner's tax-avoidance aims were twofold: first, to step up the basis in the cattle-feeding

assets received by D & S upon the liquidation of Queen, including the feed previously expensed by Queen, and thereby secure additional deductions; and second, to take advantage of the provisions of section 453, so as to defer the gain on the sale over a period of 15 years.

Queen served no business purpose and performed no function other than to enable petitioners to stage the purported sale and liquidation. We therefore apply the step-transaction doctrine to recast the transaction as though petitioners had formed D & S from the outset to purchase the feed and conduct the feeding operations. We believe that form reflects the true substance of the transaction. See *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465 (1935); *Jacobs v. Commissioner*, 21 T.C. 165 (1953), affd. 224 F.2d 412 (9th Cir. 1955). The result of our application of the step-transaction doctrine is that D & S has no basis in feed after 1971. Thus, in calculating its costs deductible from proceeds of sale in 1972, D & S cannot include any amounts attributable to the purported purchase of Queen's assets, including fully expensed feed.

In describing transactions of Queen in the discussion below, we therefore treat them as if D & S had been formed in 1971 and the transactions had been conducted in its name, rather than that of Queen.

### 3. Deductibility of Prepaid Feed Expenses in 1971

In support of their position that they are entitled to the claimed deductions for the prepayment of feed expenses in 1971, petitioners rely on a line of cases generally supporting the deductibility of prepaid feed expenses, especially our decision in *Van Raden v. Commissioner*, 71 T.C. 1083 (1979), affd. 650 F.2d 1046 (9th Cir. 1981). See *Frysinger v. Commissioner*, 645 F.2d 523 (5th Cir. 1981), affg. a Memorandum Opinion of this Court; *Cravens v. Commissioner*, 272 F.2d 895 (10th Cir. 1959), revg. 30 T.C. 903 (1958).[7]

In *Van Raden*, the taxpayers invested as limited partners in a cash-basis partnership cattle-feeding operation in December

---

[7]See *Bandes v. Commissioner*, T.C. Memo. 1982–355; *Heinold v. Commissioner*, T.C. Memo. 1979–496; *Haynes v. Commissioner*, T.C. Memo. 1979–240; *De La Cruz v. Commissioner*, T.C. Memo. 1978–8.

1972. The partnership purchased a 1-year supply of feed and some cattle in the last few days of the 1972 taxable year. Because Rev. Rul. 75–152, 1975–1 C.B. 144, dealt specifically with the issue involved, and respondent's position tracked the three-part test of that ruling, we examined, in the manner set forth in that ruling, the issue of whether the limited partners were entitled to deduct the cost of feed in the year of purchase, or whether they were limited to a deduction in the year of consumption.[8] *Van Raden v. Commissioner*, 71 T.C. at 1096. The ruling provided that a prepayment for feed is deductible only if (1) the expenditure is a payment and not merely a deposit; (2) the prepayment is for a business purpose and not merely for tax avoidance; and (3) the deduction does not result in a material distortion of income.

As in the instant case, respondent disallowed the taxpayers' deductions in the year of purchase in *Van Raden* on the grounds that there was no business purpose for the prepayment and the deduction caused a material distortion of income. The first part of the three-part test, whether the expenditure was a payment or a deposit, was not an issue in *Van Raden*.

A variety of approaches have been used by the courts to evaluate the deductibility of prepaid expenses by cash-basis taxpayers, depending on the expense item in question. In *Mann v. Commissioner*, 483 F.2d 673, 676 (8th Cir. 1973), revg. a Memorandum Opinion of this Court, the Court of Appeals noted:

There is clearly no common thread or governing principle which rationalizes and renders predictable the results concerning deductibility of advance payments in general. However, special theories and practices have developed which govern the tax treatment of advance payments for livestock feed.

---

[8]Rev. Rul. 79–229, 1979–2 C.B. 210, amplified and superseded Rev. Rul. 75–152, 1975–1 C.B. 144, but did not change the three-part test. Revenue rulings are merely statements of the Commissioner's litigating and administrative position and do not have the force of law. *Estate of Lang v. Commissioner*, 64 T.C. 404 (1975), affd. in part and revd. in part 613 F.2d 770 (9th Cir. 1980); *Stubbs, Overbeck & Associates, Inc. v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971). The tests set forth in these rulings have been applied, but not necessarily endorsed, however, by most courts discussing the prepaid feed expense issue. See *Van Raden v. Commissioner*, 71 T.C. 1083 (1979), affd. 650 F.2d 1046 (9th Cir. 1981); *Frysinger v. Commissioner*, 645 F.2d 523 (5th Cir. 1981), affg. a Memorandum Opinion of this Court; *Bandes v. Commissioner*, T.C. Memo. 1982–355. See also Ward, "Tax Postponement and the Cash Method Farmer: An Analysis of Revenue Ruling 75–152," 53 Tex. L. Rev. 1119 (1975).

In *Owens v. Commissioner*, 64 T.C. 1, 17 (1975), affd. in part and revd. in part 568 F.2d 1233 (6th Cir. 1977), we observed that the issue of prepaid feed expenses is sui generis, and, recognizing the confused history surrounding the issue, we stated that "Perhaps the only eternal guideline or principle that can be gleaned from prior decisions is that each case must be decided in light of its particular facts and circumstances." 64 T.C. at 16.

In *Van Raden*, this Court applied a variant of the three-part test set forth in respondent's revenue ruling and found that despite the favorable tax consequences that flowed from the prepayment, the primary purpose of the prepayment was to secure a year's supply of feed at the lowest possible price. We also found that the taxpayers satisfied the distortion of income test after concluding that the test is satisfied by a "substantial legitimate business purpose." 71 T.C. at 1106.

We applied the approach we adopted in *Van Raden* with respect to prepaid intangible drilling and development costs in *Keller v. Commissioner*, 79 T.C. 7, 28 (1982), affd. 725 F.2d 1173 (8th Cir. 1984). As we noted in *Keller*:

Unquestionably, the first part of respondent's test, i.e., that the expenditure must be a payment rather than a refundable deposit, is a sine qua non for deductibility in any context. See, e.g., the discussion in *Sandor v. Commissioner*, 62 T.C. 469 (1974), affd. 536 F.2d 874 (9th Cir. 1976), a prepaid interest case. With regard to the second and third parts of respondent's analysis, we are unwilling to hold that business purpose for prepayment is an independent requirement for deductibility. Rather, as we observed in *Van Raden v. Commissioner*, 71 T.C. at 1099, "There is some overlapping of the business purpose test and the distortion of income test." Insofar as cash basis taxpayers are concerned, the two concepts are so inextricably interwoven that the material distortion analysis mandated by section 446(b) must include a substantial consideration of the business purpose aspects of the transaction. In *Van Raden*, we stated that "a substantial legitimate business purpose satisfies the distortion of income test." 71 T.C. at 1106. * * * [79 T.C. at 28.]

In evaluating the deductibility of the December 1971 prepayment by Queen, we apply our approach set forth in *Van Raden* and *Keller*:

*Payment or Deposit?*

As we observed in *Keller*:

The term "payment" has a special meaning for tax purposes. It does not mean a simple transfer of money by a taxpayer. *Ernst v. Commissioner*, 32 T.C. 181 (1959). A transfer of money pursuant to a binding contract also is not enough. *Owens v. Commissioner*, 64 T.C. 1, 18 (1975), affd. in part and revd. in part 568 F.2d 1233 (6th Cir. 1977). A payment occurs only when the taxpayer's money is "irretrievably out of pocket." *Ernst v. Commissioner, supra* at 186.

If, by express, implied, or customary terms, a taxpayer retains a unilateral power to get the money back, then the money transfer is a "deposit" rather than a payment. *Owens v. Commissioner, supra; Lillie v. Commissioner*, 45 T.C. 54 (1965) (Court reviewed), affd. 370 F.2d 562 (9th Cir. 1966); *Mann v. Commissioner*, 483 F.2d 673 (8th Cir. 1973), revg. a Memorandum Opinion of this Court; *Shippy v. United States*, 308 F.2d 743 (8th Cir. 1962). See Ward, "Tax Postponement and the Cash Method Farmer: An Analysis of Revenue Ruling 75–152," 53 Tex. L. Rev. 1119, 1123–1145 (1975). This rule prevents the possibility of taxpayer abuse which would occur if, in year one, a taxpayer transfers money to a third party and takes a deduction and, in year two, he compels a return of the money and cancels the transaction supporting the deduction.

[79 T.C. at 29; fn. ref. omitted.]

We further stated that "The deposit vs. payment inquiry properly focuses only on the unilateral power of a taxpayer to compel the return of the prepaid amounts." 79 T.C. at 46. Zimmerman's bill of sale dated December 23, 1971, states that specific amounts and kinds of feed in the amount of $341,213.14 were sold to Queen, and the feeding contract of that same date recites that the feed was delivered by Queen to Zimmerman, who acknowledged its receipt. Queen's check in the amount of $342,213.14, also dated December 23, 1971, payable to Zimmerman, was paid by ONB on December 28, 1971. Also on December 28, 1971, Zimmerman purchased a certificate of deposit to secure the $210,000 loan from ONB to Packard. The feeding contract contained no provision entitling Queen to a refund at the close of the transaction for any unconsumed feed. At the close of the three rounds of feeding, Zimmerman purchased $37,111.05 worth of unconsumed feed from D & S.

Respondent contends that the $341,213.14 prepayment was a deposit rather than a payment under the theory that $210,000 was not actually paid in 1971 or used for the purchase of feed. Respondent maintains that the proceeds of the loan never left the bank, but rather were used by Zimmerman to purchase the certificate of deposit, which secured the ONB loan to Packard. Respondent asserts that no

more than \$131,213.14 was available for feed at any time during the entire program. In support of his argument, respondent points to the amounts retained by Zimmerman after rounds one and two of feeding. Respondent maintains that these amounts were retained by Zimmerman in order to purchase feed for the following round.

Based on the terms of the feeding contract, the bill of sale, and the fact that Queen's check for the entire amount of feed was paid by the bank on December 28, 1971, we conclude that at the time of payment, Queen had irrevocably committed itself to the purchase of specific items of feed within a specific year and could not compel the return of any of the prepaid amounts. Furthermore, we do not believe the resale of the excess feed to the feed yard suggests a deposit. Such disposition reflects a valid business judgment in view of the perishable nature of feed and the expense that would have been incurred in transporting it elsewhere for sale.[9]

Respondent also contends that the loan arrangement with ONB was a "circle of paper money" and petitioners should not be entitled to a deduction to the extent that the prepaid expense was paid out of the loan proceeds.

In support of his argument, respondent relies on our decision in *Burns v. Commissioner*, 78 T.C. 185 (1982). In *Burns*, the taxpayers purchased working interests in oil and gas leases and entered into turnkey drilling and completion contracts and other agreements with the sellers-promoters. The taxpayers paid in cash the full amounts of intangible drilling and development costs allowable under section 1.612–4, Income Tax Regs. In our consideration of whether the taxpayers were entitled to deduct those amounts in full we examined the underlying financing arrangements among the taxpayers, the banks, and the promoters to determine whether the IDCs were actually incurred by the taxpayers. The "financing packages" arranged by the promoters enabled the taxpayers to borrow one-half of the amounts stated in the drilling contracts through nonrecourse loans from the banks. To induce the banks to provide the financing, the loans were fully collateralized by certificates of deposit pledged by the promoters. The financing packages also included agreements between

---

[9]*De La Cruz v. Commissioner*, T.C. Memo. 1978–8.

the taxpayers and the promoters providing for repayments of the loans out of 50 percent of the net profits from production. As the notes were retired, the pledges of the certificates of deposit were reduced. If the promoters were not otherwise compensated as they desired upon repayment of the notes in full, they could force a sale of the entire working interest and receive 50 percent of the sales proceeds. We concluded that in economic substance the parties had created a 50-percent net profits interest in favor of the promoters, and, therefore, because the taxpayers in effect had paid only 50 percent of the IDCs, they were entitled to deduct only that amount.

We held further in *Burns* that the agreements among the parties were not genuine multiple-party transactions. See *Frank Lyon Co. v. Commissioner*, 435 U.S. 561, 583–584 (1978); *Burns v. Commissioner*, 78 T.C. at 213. We examined the role of the banks in the financing packages and noted that "The use of a third party in a given transaction may be made in such a way as to give the appearance of importing substance to the transaction but, in reality, the interjection of the third party may be no more than 'window dressing.' " 78 T.C. at 212. As in the present case, the bank in *Burns* made no credit checks on the borrowers nor did they require financial statements. We concluded in *Burns* that the banks were used by the promoters to conceal the true economic substance of the transaction. 78 T.C. at 213.

The situation in *Burns* is distinguishable, however, from that now before us. In *Burns*, we emphasized that the agreements placed the promoters in the position of demanding 50 percent of the net profits after repayment of the loans.

If, upon full repayment of the loans, petitioners regained the interests they had in proceeds from the sale of oil and gas prior to the loans, we would not be so inclined to question the substance of the transaction. But this is not what happens. The promoters are in a position to demand and receive the share of production formerly committed to repayment of the loans. This demonstrates that the promoters held a 50-percent net profits interest when the package of agreements was entered into and that the interest continues in them until the sale of the leaseholds. Even then, the promoters receive 50 percent of the net proceeds of the sale of the leaseholds in the guise of a 50-percent commission.

As to the 50-percent portion of the IDCs which were disallowed, petitioners, in substance, only lent their names to be used on the promissory notes, except in the case of CPC where other wells were pledged as collateral for the losses. This additional security was merely "window dressing" as to the

loans because the banks, at all times, held certificates of deposit equal to the unpaid balances on the loans. When the loans were repaid, petitioners continued to receive only 50 percent of the proceeds from the sale of oil and gas.
[78 T.C. at 211.]

In contrast, petitioners were entitled at all times to the proceeds from the sale of the cattle, even though ONB may have been looking first to the proceeds of cattle sales as a source for repayment of the loan to Packard.

This case is also to be distinguished from those cases where a true lending transaction is lacking due to the contingency of repayment upon the success or failure of the business transaction. See *Graf v. Commissioner*, 80 T.C. 944, 951 (1983). Packard's obligation to ONB was not contingent on future profits. She was personally liable for the debt, and repayment was subject to no contingency.

Although Packard's loan was fully collateralized with a certificate of deposit purchased and pledged by Zimmerman, Packard was the actual borrower and the primary obligor on the loan. Cf. *Estates of Helliwell v. Commissioner*, 77 T.C. 964 (1981). This is not a case, as was *Burns*, where the use of a third party is no more than "window dressing."

We therefore hold that the loan was a genuine multiple-party transaction with economic substance and that petitioners paid the full prepaid feed expense of $341,213.

### Business Purpose or Tax Avoidance?

The focus of the business purpose versus tax-avoidance test is the timing of the deduction. *Van Raden v. Commissioner*, 71 T.C. at 1096. Because business purpose is a question of fact, we must look to all of the facts and circumstances to determine whether petitioners have proved a business purpose for the December 1971 feed purchase. *Van Raden v. Commissioner*, 71 T.C. at 1097.

Generally, the distinguishing factor for the allowance or disallowance of the deduction is whether the taxpayer has established a reasonable expectation of receiving some business benefit from the prepayment. *Lillie v. Commissioner*, 45 T.C. 54, 62 (1965), affd. per curiam 370 F.2d 562 (9th Cir. 1966); *Shippy v. United States*, 308 F.2d 743, 747 (8th Cir. 1962); *Ernst v. Commissioner*, 32 T.C. 181 (1959).

A business purpose exists if the prepayment fixes maximum prices for feed, secures an assured feed supply, or secures preferential treatment in anticipation of a feed shortage. *Van Raden v. Commissioner*, 71 T.C. at 1101; *Ernst v. Commissioner*, 32 T.C. at 186.[10] The parties here stipulated that the feeding agreement dated December 23, 1971, fixed the price of feed.

In *Van Raden*, testimony of the manager of the cattle-feeding operations and corroborating statistical evidence established that the feed was purchased in December because the price was lowest at that point, and the price was fixed by purchasing a year's supply in advance, thereby establishing a business purpose for the purchase at that time. *Van Raden v. Commissioner*, 71 T.C. at 1097–1099.

Securing the feed at the lowest possible price was not represented to be the primary purpose of the prepayment in this case. Petitioners rely on the testimony of Blackman, who managed the cattle-feeding program, to prove a business purpose for the prepayment. Blackman testified that the purchase was made in December to fix the price for the entire feeding cycle and to assure the availability of the full amount of feed necessary to complete the feeding. According to Blackman's testimony, the prepayment also enabled Queen to reserve feeding space with the Zimmerman feed lot and enabled petitioners to obtain financing for the cattle and thereby benefit from leveraging. Blackman testified that although lower feed prices in December would have been a good reason to buy feed at that time, that would have been only one of many factors that compelled the purchase in December. He testified further:

We were making a deal in December that we thought would result in feeding commencing immediately. It happened based on judgment as things developed that we did not commence feeding until February.

So the fact that if we had the advantage of foresight we might have saved a couple of dollars by deferring the purchase to February. It was not a fact that would have been available to us when we anticipated beginning feeding very shortly.

\*      \*      \*      \*      \*      \*      \*

---

[10]See also *Heinold v. Commissioner*, T.C. Memo. 1979–496.

In order to close this transaction in December, we had to prepay the feed and pledge the feed to the bank.[11]

Respondent contends that the purpose of the decision to buy feed in December 1971, rather than in 1972 when it was actually consumed, was tax avoidance, not business benefit. The obvious tax advantages of the transaction and our disregard of an identity for Queen separate from D & S do not, however, taint the entire program. It appears that petitioners were overreaching in attempting to defer taxable income beyond the time permitted by the well-established rules governing prepaid feed expenses by the use of an artificial installment sale, and to obtain additional deductions through a stepped-up basis in the fully expensed feed through the corporate liquidation. Nonetheless, we must evaluate the prepaid feed aspect of the transaction on its own merit, and we must decide that issue on the evidence and not on the basis of suspicion.

The uncontradicted evidence that the purchase was appropriate to the business of Queen (i.e., D & S) cannot be ignored. The evidence of the trend in the price of corn, which accounted for approximately 75 percent of the feed purchased by Queen, is inconclusive. Neither that data nor any other evidence impeaches Blackman's claim that he and his associates used their best judgment on when to purchase feed. The businessman is allowed discretion to make business judgments. *Van Raden v. Commissioner*, 71 T.C. at 1101; *Clement v. United States*, 217 Ct. Cl. 495, 580 F.2d 422, 427 (1978). For these reasons, we decline to hold that the primary purpose of the prepayment was tax avoidance.

## Distortion of Income

As a cash-basis taxpayer, Queen paid for the cattle feed and deducted the prepaid feed expense in that year in accordance with its method of accounting. Sec. 461; secs. 1.471–6(a) and 1.162–12(a), Income Tax Regs. Respondent contends that the prepayment resulted in a material distortion of income,

---

[11]See the Commissioner's position in Rev. Rul. 75–152, 1975–1 C.B. 144, which states that whether the prepayment was a condition imposed by the seller and whether such condition was meaningful should be taken into consideration in determining whether there was a business purpose for the prepayment. This statement is also contained in Rev. Rul. 79–229, 1979–2 C.B. 210.

relying upon section 446(b),[12] which gives the Commissioner discretionary power to require a recomputation of income if the taxpayer's method does not clearly reflect income. Respondent's determination will generally not be overturned in the absence of evidence of abuse of discretion. *Resnik v. Commissioner*, 66 T.C. 74, 78 (1976), affd. 555 F.2d 634 (7th Cir. 1977); *Sandor v. Commissioner*, 62 T.C. 469, 477 (1974), affd. per curiam 536 F.2d 874 (9th Cir. 1976). The taxpayer bears a heavy burden to overcome a determination of the Commissioner in this area. *Keller v. Commissioner*, 79 T.C. at 38; *Fort Howard Paper Co. v. Commissioner*, 49 T.C. 275, 284 (1967), citing *Commissioner v. Hansen*, 360 U.S. 446 (1959), and cases subsequent to it.

In *Van Raden*, we rejected the taxpayers' argument that the discretionary power under section 446(b) is not available to the Commissioner when dealing with farmers who use the cash method of accounting. 71 T.C. at 1102–1103. Accord *Clement v. United States*, 217 Ct. Cl. 495, 580 F.2d 422, 427 (1978). See also *Keller v. Commissioner*, 79 T.C. 7 (1982), affd. 725 F.2d 1173 (8th Cir. 1984); *Sandor v. Commissioner, supra.*

In *Frysinger v. Commissioner*, 645 F.2d 523, 526 (5th Cir. 1981), affg. a Memorandum Opinion of this Court, the Court of Appeals recognized the Commissioner's broad powers under section 446(b), but noted his lack of success in using his discretionary authority to challenge prepaid farm deductions, "principally because of the special treatment traditionally granted farmers under the tax regulations." In affirming our decision for the taxpayer, the Court of Appeals stated:

> We emphasize that our holding is limited to the facts in this case. We do not hold the Commissioner can never exercise his discretion under section 446(b) to disallow a prepaid feed deduction by a farmer. Rather we hold that where the taxpayer is a farmer covered by the special provisions allowing farmers to take current deductions for feed expenses, where the prepayment is for a business purpose and not merely tax avoidance, and where it is in line with normal business practice and not unreasonable, the Commissioner cannot use his discretionary authority to vitiate the benefits granted the taxpayer by his own regulations merely because the taxpayer's method may

---

[12]Sec. 446 provided in pertinent part:

SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

otherwise result in a distortion of income. If "passive farmers" are to be treated differently, the change must come from Congress, as it has under IRC sec. 464, which now requires certain investment farmers to defer feed expenditure deductions at least until the feed is used or consumed. [645 F.2d at 528.]

Whether an accounting method materially distorts or clearly reflects income is a question of fact. *Van Raden v. Commissioner,* 71 T.C. at 1104; *Resnik v. Commissioner,* 555 F.2d at 636; *Sandor v. Commissioner,* 62 T.C. at 484. In support of his claim that the prepayment resulted in a material distortion of income, respondent notes that the prepayment was the sole expense of Queen, and Queen had no income. He claims that the distortion continued in 1972 because the installment sale allowed D & S to take additional losses without offsetting income, and that the distortion would have continued if the program had been carried out by petitioners. Respondent also points out that at the individual taxpayer level, petitioners' unrelated income was essentially eliminated by the loss resulting from the prepayment, yet petitioners subsequently disregarded the income side of the transaction. Respondent urges us to apply the distortion of income test at the shareholder level if distortion is not found at the entity level.

We held in *Van Raden* that section 446(b) applies to prepaid feed expenses at the partnership level for the reasons we expressed in *Resnik v. Commissioner, supra,* and we declined to examine the distortion of income test at the partner level.[13] 71 T.C. at 1103–1104 & n. 4. In this case, petitioners invested in the cattle-feeding program through a subchapter S corporation, which is treated as an entity distinct from its shareholders. We have treated the payment as if it had been made by the partnership. That petitioners obtained tax benefits from the loss is beside the point, and examination of the distortion of income test at the individual level is therefore inappropriate. See *Brannen v. Commissioner,* 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); *Van Raden v. Commissioner,* 71 T.C. at 1112 (concurring opinion of Judge Tannenwald).

---

[13]In *Resnik v. Commissioner,* 66 T.C. 74 (1976), affd. 555 F.2d 634 (7th Cir. 1977), we held that sec. 446(b) must first be applied at the partnership level. Because we found the prepaid interest deduction caused a material distortion of the partnership's income, it was not necessary to examine distortion at the partner level. The test was applied at both levels in *Clement v. United States,* 217 Ct. Cl. 495, 580 F.2d 422 (1978).

Respondent argues that the purchase of feed in December 1971 caused a material distortion of income because the feed was on hand for a period longer than 1 year. Section 1.461–1(a)(1), Income Tax Regs., provides that an expenditure may not be deductible in the taxable year in which it is made if it results in the creation of an asset having a useful life extending substantially beyond the close of the taxable year. As we have stated repeatedly, cattle feed is not a period cost, with which this regulation relates, but rather, a product cost, the exhaustion of which depends upon the number of cattle and their rate of consumption, not the passage of time. *Van Raden v. Commissioner*, 71 T.C. at 1107–1108; *Frysinger v. Commissioner*, 645 F.2d at 527–528.[14]

Blackman testified that the expenditure was calculated to meet the feeding needs for 1 year. Furthermore, the feeding contract required Zimmerman to complete feeding by November 1, 1972. It was apparently anticipated at the time of purchase that the feed would be consumed within the period of 1 year.

In determining whether the prepaid feed expense created a material distortion of the partnership's income in *Van Raden*, we said:

> Because the method of accounting and the nature of the trade or business are so interdependent, we conclude that the distortion of income must not be examined in a vacuum but in light of the business practice or business activities which give rise to the transaction which the Commissioner has determined must be accorded a different accounting treatment. For example, material distortions of income may occur if the sales force of a business is more successful in December than in January, yet such a distortion would not require adjustment to clearly reflect income because the distortion resulted from the business activity itself. Should the result be different if the taxpayer purchases a year's supply of its primary cost item at its lowest cost consistently from year to year? We do not think so. In short, a substantial legitimate business purpose satisfies the distortion of income test. We recognized this implicity in *Sandor v. Commissioner, supra*. See *Stokes v. Commissioner*, 22 T.C. 415 (1954); *Maple Leaf Farms, Inc. v. Commissioner*, 64 T.C. 438 (1975); *Hi-Plains Enterprises, Inc. v. Commissioner*, 60 T.C. 158 (1973), affd. 496 F.2d 520 (10th Cir. 1974). [71 T.C. at 1105–1106.]

---

[14]*Bandes v. Commissioner*, T.C. Memo. 1982–355; *Heinold v. Commissioner*, T.C. Memo. 1979–496; *Haynes v. Commissioner*, T.C. Memo. 1979–240.

Although the inventory method would undoubtedly produce a greater degree of exactness in the computation of taxable income, the regulations expressly permit farmers to use the cash method. In light of this historical concession to farmers and our finding that a valid business purpose existed for the 1971 feed purchase, we conclude, following our decision in *Van Raden,* that petitioners are entitled to deduct in 1971 the cattle-feed expenditures paid in that year.

In view of the rationale for our decision and the fact that an appeal will not be to the Ninth Circuit Court of Appeals, we need not consider the applicability of the "one-year rule" enunciated by that circuit in *Zaninovich v. Commissioner,* 616 F.2d 429 (9th Cir. 1980), revg. 69 T.C. 605 (1978), and followed in *Commissioner v. Van Raden,* 650 F.2d 1046 (9th Cir. 1981), affg. 71 T.C. 1083 (1979).[15]

## *4. Wainwright's Theft Loss Claim*

Wainwright claims that D & S suffered a net operating loss of $256,596.84 in 1973 as a result of Packard's retention of partnership funds in that amount. His claim is based on the transfer of proceeds from the partnership's cattle-feeding operation in amount of $256,596.84 from the D & S account at ONB in Omaha to Packard's personal account at Chemical Bank. Wainwright argues that the transfer was a theft of partnership funds, for which D & S may claim a theft loss under section 165, and that he is entitled under section 172 to carry back and carry over his share of that net operating loss.

Petitioner Wainwright bears the burden of proving his entitlement to a net operating loss deduction by establishing that D & S was entitled to the claimed theft loss deduction. *Welch v. Helvering,* 290 U.S. 111 (1933); *New Colonial Ice Co. v.*

---

[15]The "one-year rule" allows a full deduction in the year of payment where an expenditure creates an asset having a useful life of 1 year or less. *Commissioner v. Van Raden,* 650 F.2d 1046, 1050 (9th Cir. 1981), affg. 71 T.C. 1083 (1979); *Zaninovich v. Commissioner,* 616 F.2d 429, 432 n. 6 (9th Cir. 1980), revg. 69 T.C. 605 (1978). As stated by the court in *Zaninovich:*

"While the "one-year rule" is strictly applied to allow a full deduction in the year of payment where an expenditure creates an asset having a useful life beyond the taxable year of twelve months or less, it is not applied in the same manner in the other direction. Where an expenditure creates an asset having a useful life beyond the taxable year of more than twelve months, the "one-year rule" has been used as a guidepost only, and not as a rigid rule requiring automatic capitalization of every expenditure which creates an asset having a useful life in excess of one year. [Citations omitted.]"

*Helvering*, 292 U.S. 435 (1934); Rule 142(a), Tax Court Rules of Practice and Procedure.

The determination of whether a theft loss has been sustained depends upon the law of the jurisdiction where the loss occurred, in this case the law of the State of Nebraska. *Monteleone v. Commissioner*, 34 T.C. 688, 692 (1960).

Under the terms of the D & S partnership agreement, petitioners were to share equally in profits and losses. The agreement provided further that a partner was restricted from using partnership property "for any purpose other than a proper Partnership purpose," without the consent of all other partners. Construction of the agreement and the rights and liabilities of the partners were to be governed by Nebraska law.

Under Nebraska law:

(1) A partner is co-owner with his partners of specific partnership property holding as a tenant in partnership.

(2) The incidents of this tenancy are such that:

(a) A partner * * * has an equal right with his partners to possess specific partnership property for partnership purposes; but he has no right to possess such property for any other purpose without the consent of his partners. [Neb. Rev. Stat. sec. 67–325 (1981).]

Wainwright's contention that D & S suffered a theft loss is not supported by the facts. Petitioners considered their cattle-feeding investment as a joint investment, and Wainwright shared in the deductions attributable to it. Petitioners considered the $210,000 ONB loan as a joint liability despite the fact that Packard was the sole obligor on the note. Under the form of the transaction adopted by petitioners, D & S was liable to Packard for $385,000 for its purchase of the Queen stock. At trial, Wainwright testified:

Q. Okay. And isn't it correct that you knew that the $256,000 was supposed to be used to pay Virginia for the stock purchase?

A. I knew Mrs. Wainwright was at that time—she was to receive monies over a period of time, yes. That was the 15 year framework.

Q. Okay. And the $256,000 would form the basis for her receiving those monies? In other words isn't it correct that the $256,000 was supposed to stay in D and S's account, be invested and paid out to Mrs. Wainwright?

A. The monies that came out of the cattle feeding operation, I believe belong to D and S as a result of the absorption of Queen. So, yes.

\*       \*       \*       \*       \*       \*       \*

Q. * * * when I asked you how else was that note—note supposed to get paid off, you made reference to not only Mrs. Wainwright's funds, but all of yours too. And my question to you is, if she had done that and paid off the $210,000 note with funds—with your joint funds that you had back then in 1972, would you have complained?

A. It was a business transaction. We were in a partnership so why should I complain.

There is no evidence that the funds were used for other than a partnership purpose. The funds were used to satisfy the $210,000 loan and part of the purported installment obligation owed to Packard. Wainwright participated in the design and implementation of the investment program. His present claim appears to arise out of a subsequent domestic dispute rather than a genuine partnership loss. He is not entitled to a net operating loss deduction.

We have considered all other arguments of the parties and find them unpersuasive. To reflect the foregoing and concessions by the parties,

*Decisions will be entered under Rule 155.*